No. 86,320

STATE OF KANSAS, *Appellee*, v. MICHAEL L. JENKINS, *Appellant*.

(39 P.3d 47)

Opinion filed February 1, 2002.

*Craig Shultz*, of Law Office of Craig Shultz, P.A., of Wichita, argued the cause and was on the briefs for appellant.

*Debra S. Peterson*, assistant district attorney, argued the cause, and *Nola Foulston*, district attorney, and *Carla J. Stovall*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

BRAZIL, J.: Michael Jenkins appeals his jury conviction of two counts of involuntary manslaughter and one count of making false information following a traffic collision on August 19, 1999, involving two fatalities. While initially charged with two counts of second-degree murder and two counts of making false information, the jury settled on the lesser included offense of involuntary manslaughter. The State's theory at trial was that Jenkins recklessly drove the day of the collision, knowing his propensity for epileptic seizures would endanger other drivers.

Jenkins' vehicle collided with the back of Sherri Kim Yauk's vehicle as Yauk was stopped at a red light. The collision caused the deaths of Yauk's two children, Brett and Laura. Prior to the collision, one witness observed Jenkins driving 5 to 20 miles over the speed limit of 40 miles per hour. Jenkins never slowed before colliding with Yauk.

Mindy Johnson, who was working as a traffic accident investigator the day of the accident, testified Jenkins said "he was driving, he felt dizzy, and the next thing he knew, he had been involved in an accident."

Officer Steven Kenney tested Jenkins following the collision to determine whether Jenkins was under the influence of any medications or was otherwise impaired. His evaluation, which included field sobriety tests, breath tests, and blood and urine tests, revealed that Jenkins was not under the influence of any substances.

Jenkins testified he learned about his epilepsy in 1974 or 1975, but that it did not affect his driving until 1990.

The State presented evidence of Jenkins' involvement in seven prior automobile accidents during the period beginning in 1990 to February 26, 1999.

### August 16, 1990

Jenkins, who was involved in an accident, left the scene, but was later found. According to Officer Willard Buffin, Jenkins said that "he had felt faint, had noticed some rubbing of something on his vehicle as he was driving, had pulled over and realized he had been involved in an accident, and was on his way home to report the accident when he was stopped by an officer."

Following the collision, Jenkins saw Gina Kader, a medical doctor. Jenkins testified he told Dr. Kader about the collision, which he thought was caused by a seizure.

### April 9, 1992

Jenkins "rear-ended" a truck. Jenkins' contemporaneous statement was that he "[w]as driving north on Hillside and felt light headed. Didn't realize I had accident until pulled from my vehicle. I had seizure and was involved in accident." Dr. Kader, who was contacted by a traffic accident investigator, indicated that she believed the accident was caused by a seizure.

### May 29, 1992

The police report in this accident included Jenkins' own description of the accident: "I was east bound on Kellogg in the center lane and felt myself starting to have a seizure. I was in traffic and

couldn't get pulled off the road. Next I realized I had been in an accident and pulled off of Kellogg, inspected vehicle as officer pulled up." Jenkins testified that he told Dr. Kader about the April 9 and May 29, 1992, accidents as well.

Jenkins wanted a second opinion, and went to see Mark Mandelbaum, a medical doctor, around late August 1992 or early September 1992. According to Dr. Mandelbaum, Jenkins reported "having up to eight seizures a month" and that he had recently been in an automobile collision. Dr. Mandelbaum testified that he recommended Jenkins not drive, but Jenkins indicated he was going to continue to do so.

*January 27, 1993*

Jenkins' wrote the following after this accident: "Arriving home from work & felt dizzy, tried to get off K-15. I started to pull off onto a driveway. That is the last thing I remember until someone was pulling me out of wrecked vehicle."

*March 22, 1993*

Jenkins was involved in an accident with Candace Flattick. Trooper Mark Wright testified Jenkins said he had had a seizure prior to the accident. After the collision, Wright checked Jenkins' driving record and discovered that Jenkins had a history of traffic collisions. When confronted with the prior collisions, Jenkins "indicated . . . that he had had seizures." After discovering this information, Wright sent a letter to the Department of Revenue (DOR) to express his concerns about Jenkins' driving record. The DOR sent a letter, dated April 7, 1993, to Jenkins asking him to see a physician for an evaluation.

Jenkins testified he again saw Dr. Kader following the March 22, 1993 collision. Presumably, in response to the DOR's letter, Jenkins testified he told Dr. Kader of his prior collisions and that he believed them to have been caused by his seizures. Dr. Kader recommended Jenkins not drive. The DOR in its June 2, 1993, letter revoked Jenkins' license "until we receive an acceptable medical report which indicates that you have remained seizure free for six (6) full months, that you are medically capable of operating a motor vehicle safely, and that you should be granted driving priv-

ileges." Jenkins testified he had gone a year without a driver's license into 1994.

Dr. Kader's notes of September 14, 1993, point out that Jenkins "resents not being able to drive." Dr. Kader's notes from April 6, 1994, revealed that she felt Jenkins' "seizures [were] well controlled." Jenkins signed a medical form April 19, 1994, on which he wrote the following remarks: "In March of 1993 I had a seizure and caused an accident. I have not had any seizures since then. I have taken medication for epilepsy for 22 years."

In response to a different question on the same form, Jenkins affirmatively responded to the question of whether he had experienced or had been treated for blackout spells, dizzy spells, epilepsy, seizures, loss or alteration of consciousness. However, Jenkins failed to complete the follow up question required by the form requesting the date of his last such episode. On the condition that Jenkins submit annual medical reports, Jenkins' license was reinstated on June 2, 1994. The medical form Jenkins signed dated January 19, 1995, also failed to list the date of Jenkins' last episode. Dr. Kader also failed to answer on the form whether, in her professional opinion, Jenkins was physically or mentally capable of safely operating a motor vehicle. As a result of the 1995 medical form, the DOR continued Jenkins' license.

According to Jenkins' testimony, he again began to experience seizures toward the end of 1995. About this time Jenkins first began seeing Dr. Rizwan Hassan, a neurologist. Dr. Hassan evaluated Jenkins on January 19, 1996. Jenkins testified he told Dr. Hassan about the prior collisions. Dr. Hassan testified Jenkins said he was averaging one to two "spells" per month. On the medical form Jenkins filled out dated January 19, 1996, Jenkins indicated he had not experienced "blackout spells, dizzy spells, epilepsy, seizures, loss or alteration of consciousness." The part of the form filled in by Dr. Hassan disclosed that Jenkins had had a seizure on January 16, 1996. Dr. Hassan based this disclosure on what Jenkins had stated. The DOR in its April 1, 1996, letter informed Jenkins of its decision to not allow him to drive and again revoked his driving privileges.

Jenkins testified Dr. Hassan prescribed medication which was effective in controlling the seizures. Jenkins submitted another medical form dated August 23, 1996. Jenkins admitted to having a loss of consciousness within the past 3 years and indicated the last such loss of consciousness was January 19, 1996. Dr. Hassan indicated on the form that the date of Jenkins' last unconscious episode was January 19, 1996. As a result of this medical form, the DOR permitted Jenkins to reapply for a driver's license on September 9, 1996. He passed a full driver's examination test and restricted driving privileges were reinstated.

### December 20, 1996

According to Trooper Jimmy Atkinson:

"[Jenkins] was traveling in a westerly direction on Harry Street, and there's a grassy area of the embankment which runs down to I-135. Appears that he lost consciousness, traveled down the embankment, still in a westerly direction, and went into northbound traffic—at that time it was rush hour—and collided into one vehicle, kept going. And the one vehicle that he collided, collided into another vehicle which was in the inside lane, and I believe Mr. Jenkins' vehicle thereafter traveled maybe a couple hundred feet before coming to rest."

Jenkins described, in his contemporaneous written statement, what he remembered from the accident: "I was driving west on Harry Street just east of I-35 when I felt light headed. The next I remember was being involved in an accident just south of Harry on I-35."

Jenkins had to complete another medical form dated February 21, 1997. While admitting to (1) having an accident; (2) having had his license revoked; and (3) having a blackout spell, dizzy spell, epilepsy, seizure, loss or alteration of consciousness within the past 3 years, he did not indicate the date of his last such episode. His driving privileges were thereafter continued, with an annual medical report being required.

On February 15, 1999, Jenkins signed another medical form. He indicated his last date of "blackout spells, dizzy spells, epilepsy, seizures, loss or alteration of consciousness" was in November 1996.

*February 26, 1999*

Patricia Byers, a traffic accident investigator, described this wreck as a rearend collision involving three vehicles. Jenkins was driving one of the vehicles. Byers talked with Jenkins after the accident and Jenkins described the event as follows: "He told me he wasn't feeling well; that he was light-headed and had felt dizzy and had been trying to pull his vehicle over before the accident, and he didn't remember anything past turning off—turning onto Douglas Street."

Jenkins had possession of the medical form he signed on February 15, 1999, until as late as March 2, 1999. Dr. Hassan did not sign the form until March 3, 1999. Dr. Hassan indicated on the form that January 1996 was Jenkins' last episode. Dr. Hassan testified that Jenkins had failed to mention the February 26, 1999, incident. Based on this medical form, the DOR again continued Jenkins' driving privileges.

Dr. Hassan testified Jenkins did mention the February 26, 1999, collision during an appointment on August 6, 1999, but that Jenkins claimed there was no seizure involved. Jenkins visited Dr. Hassan again on September 26, 1999, and confessed that he had two seizures on August 19, 1999.

## I. SUFFICIENCY OF THE EVIDENCE

Jenkins argues the State failed to present sufficient evidence to support his convictions of involuntary manslaughter. This court in *State v. Jamison*, 269 Kan. 564, 571, 7 P.3d 1204 (2000), explained the standard of review for sufficiency of evidence:

"When the sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. [Citation omitted.]"

The jury convicted Jenkins of the version of involuntary manslaughter requiring proof of the unintentional killing of a human being committed recklessly. See K.S.A. 2000 Supp. 21-3404(a). The trial court instructed the jury on the following definition of recklessness:

"Reckless conduct means conduct done under circumstances that show a reali-
zation of the imminence of danger to the person of another and a conscious and
unjustifiable disregard of that danger. The terms 'gross negligence,' 'culpable neg-
ligence,' 'wanton negligence' and 'wantonness' are included within 'reckless.' "

The above definition is substantially similar to the definition of
"reckless conduct" found at K.S.A. 21-3201(c).

Based on the State's theory, the issue is whether a rational fact-
finder could have found that Jenkins demonstrated a realization of
the imminence of danger and a conscious and unjustifiable disre-
gard of that danger when he decided to drive his car prior to the
fatal collision.

Jenkins argues that his history of accidents caused by seizures
was not sufficient evidence to support the jury's verdict. Jenkins
relies on *State v. Huser*, 265 Kan. 228, 959 P.2d 908 (1998). This
court in *Huser* reviewed the State's appeal from the trial court's
dismissal of two counts of reckless aggravated battery. The *Huser*
court affirmed the district court, holding that evidence of driving
under the influence does not, standing alone, amount to reckless
behavior. 265 Kan. at 234.

The *Huser* court relied on and quoted extensively from *State v.
Mourning*, 233 Kan. 678, 664 P.2d 857 (1983). The *Mourning* court
considered whether reckless driving and driving under the influ-
ence of alcohol or drugs were the same offense for double jeopardy
purposes. The *Mourning* court concluded that the two crimes re-
quired different evidence. 233 Kan. at 681. In its analysis, the
*Mourning* court addressed the State's argument that "any time a
person under the influence of alcohol or drugs operates a vehicle
he does so in willful or wanton disregard for the safety of others."
233 Kan. at 682. The *Mourning* court rejected this argument by
pointing out that driving under the influence only requires driving
when impaired, not swerving or driving recklessly. 233 Kan. at 682.

Jenkins would have this court interpret *Huser* as standing for the
proposition that there can be no criminal liability for reckless be-
havior anytime a person drives knowing he or she suffers from any
condition that might preclude his or her ability to safely operate a
vehicle. Such cannot be the law. The better interpretation of *Huser*

is simply that the mere proof of driving under the influence is insufficient to prove recklessness.

The State has presented sufficient evidence of recklessness. The State's evidence showed that Jenkins' history of past accidents was caused by his susceptibility to seizures. The State provided evidence of seven such accidents. This case is different from *Huser*. In *Huser*, there was no evidence that the defendant had a conscious disregard for a known danger.

The *Huser* court also pointed out that "[o]ne's behavior is only reckless if he or she realizes that his or her conduct creates imminent danger to another person but consciously and unjustifiably disregards the danger. [See K.S.A. 21-3201(c).]" 265 Kan. at 234. Jenkins' seven prior collisions provided sufficient evidence to show that Jenkins knew of the imminent danger he created for other motorists.

Based on *Huser*, Jenkins is correct to note that driving in an impaired condition is alone insufficient evidence of recklessness. Had the seizure been Jenkins' first, he would not have had any criminal liability because he would not have had any reason to believe he was putting other motorists in danger by driving. Here, the jury understandably found that Jenkins knew of the imminent danger before driving and consciously disregarded it. The seizure was not a surprise to Jenkins.

## II. LACK OF CAPACITY

Jenkins argues the trial court erred in failing to instruct the jury (1) that the mere act of driving with an epileptic condition without proof of an additional act of recklessness cannot satisfy the State's burden; and (2) that it is an absolute defense if the jury would find that Jenkins suffered from an epileptic seizure and was, therefore, unable to control his actions.

The court in *State v. Mitchell*, 269 Kan. 349, 355, 7 P.3d 1135 (2000), explained the analysis for reviewing jury instructions:

"When reviewing challenges to jury instructions, we are required to consider all the instructions together, read as a whole, and not to isolate any one instruction. If the instructions properly and fairly state the law as applied to the facts of the case, and a jury could not reasonably have been misled by them, the instructions

do not constitute reversible error even if they are in some way erroneous. [Citation omitted.]"

In a criminal action, the district court must instruct the jury on the law applicable to the defendant's theories for which there is supporting evidence. *State v. Barnes*, 263 Kan. 249, 265, 948 P.2d 627 (1997).

Jenkins requested the following instruction:

"The mere act of driving in an impaired condition cannot, as a matter of law, satisfy the requirements of recklessness as defined in these instructions. The State must prove an independent act of recklessness beyond that of knowing one has or may have a condition of impairment in their driving."

The trial court refused to give the instruction. Jenkins stated in his brief on appeal that the issue here was linked to his prior arguments regarding reckless conduct and provided no further analysis beyond pointing out how the trial court should have instructed the jury on the defendant's theory of the case.

The State first argues that it provided proof of the following additional indicia of recklessness: (a) Jenkins' prior accidents; (b) his decision to drive after being warned not to; and (c) his failure to report past seizures while driving. Second, the State responds by pointing out how Jenkins' attorney nevertheless argued the theory that the mere act of driving while in an impaired condition cannot meet the reckless standard.

As our analysis of the first issue suggests, the act of recklessness was Jenkins' decision to drive knowing his propensity to have seizures. The State proved this recklessness through Jenkins' prior collisions, Jenkins' decision to drive despite being warned by Dr. Mandelbaum and Dr. Kader not to drive, and Jenkins' failure to report seizures to Dr. Hassan and the DOR. All these facts show Jenkins' knowledge of his impaired condition and, thereby, his knowledge of his danger to other motorists. It is not clear how Jenkins could believe the State was trying to rely on the "mere act of driving while in an impaired condition." On the contrary, Jenkins' requested instruction was inappropriate because the State did not rely on the mere act of driving while in an impaired condition. The State offered evidence of an impaired condition, plus sufficient

evidence of Jenkins' knowledge that such condition would be dangerous to others and that he disregarded such danger.

Second, Jenkins argues it was error for the trial court to refuse to give the following instruction:

"If you find that the defendant suffered from a seizure or epileptic attack at the time of the alleged commission of the offenses charged, and was therefore unable to control his actions at that time, that is an absolute defense to the charges brought against him and you must find the defendant not guilty."

The State's theory is that Jenkins' criminal act occurred *before* the seizure—that Jenkins' criminal actions were performed while he was in complete control. Thus, unfortunately, while in complete control, his actions were not guided by his knowledge that his actions would become out of control. He knew he could potentially lose physical control over his body because he had had seven prior collisions all related to or caused by seizures. It is this disregard for the danger to other motorists that the State is citing as the relevant criminal act.

The State is relying on a theory in this case that Jenkins is unable or unwilling to accept. This theory is that the act of driving knowing the propensity for seizures amounts to reckless behavior. Jenkins relies on *Huser* to support his position that the law of Kansas does not permit the State to use this theory. *Huser* does not support this position. Furthermore, other jurisdictions have accepted the theory used by the State in this case.

The court in *Com. v. Cheatham*, 419 Pa. Super. 603, 611-12, 615 A.2d 802 (Pa. Super. 1992), summarized the issue as follows:

"An epileptic seizure while driving and an ensuing fatal accident is an example law school textbooks use to distinguish cases in which there is no criminal culpability from those in which there is criminal responsibility. See S. Kaddish and S. Schulhofer, *Criminal Law and its Processes*, p. 195 (Little, Brown and Co. 1989). The case most often cited is *People v. Duchenne*, 2 N.Y.2d 133, 157 N.Y.S.2d 558, 138 N.E.2d 799 (1956). In that case, Duchenne killed four children when he lost control of his car during an epileptic seizure. The question before the *Duchenne* court was whether the evidence was sufficient to indict. Duchenne argued the state had no evidence of the *mens rea* required to indict for involuntary manslaughter. The New York court held that, assuming the truth of the indictment as it must on demurrer, Duchenne knew he was subject to epileptic seizures. That knowledge and the choice to drive, the court said, amounted to culpable negli-

gence. The court distinguished Duchenne's behavior from that of a person for whom the seizure was unexpected. An unexpected attack, the court reasoned, is altogether different, suggesting a lack of criminal culpability. *Cf. Malcolm v. Patrick*, 147 So.2d 188, *cert. denied* 148 So.2d 278 (Fla. App. Div.1962) (tort liability depends on foreknowledge of epilepsy).

"The defining difference between the epileptic who drives with the knowledge that he or she is seizure prone and the unsuspecting epileptic who drives is choice. One chooses to take the risk; the other does not know he is taking the risk. The Pennsylvania Supreme Court defined criminal culpability in terms of choice in *Commonwealth v. Hicks*, 502 Pa. 344, 466 A.2d 613 (1983), as pertaining to drivers who know or should know that death is a probable consequence of their violations of the Motor Vehicle Code and who 'should reasonably anticipate that their conduct is likely to produce death.' "

Because the State's theory in this case was that Jenkins' criminal act took place before the seizure, the district court properly left out the requested instruction on Jenkins' purported defense.

## III. EVIDENCE OF THE DEFENDANT'S PRIOR ACCIDENTS

Third, Jenkins argues the trial court erred in allowing evidence of his prior accidents. The admission of evidence lies within the sound discretion of the trial court. *State v. Lumley*, 266 Kan. 939, 950, 976 P.2d 486 (1999). An appellate court's standard of review regarding a trial court's admission of evidence, subject to exclusionary rules, is abuse of discretion. Judicial discretion is abused when judicial action is arbitrary, fanciful, or unreasonable. If reasonable persons could differ as to the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion. One who asserts that the court abused its discretion bears the burden of showing such abuse of discretion. 266 Kan. at 950.

Evidence of a prior crime or civil wrong is admissible to prove his or her knowledge under K.S.A. 60-455.

This court in *State v. Simkins*, 269 Kan. 84, 92, 3 P.3d 1274 (2000), described the general rule governing admission of evidence under K.S.A. 60-455:

"Three requirements must be met in order to introduce evidence under K.S.A. 60-455: (1) The evidence is relevant to prove one of the facts specified in the statute; (2) the fact is a disputed, material fact; and (3) the probative value of the evidence outweighs its potential prejudice. If the requirements for admission are

met, the scope of appellate review is limited to whether the trial court abused its discretion. [Citation omitted.]"

Jenkins argues evidence of the prior collisions was "clearly irrelevant." Furthermore, Jenkins argues the prejudicial effect of the prior collisions outweighed what probative value the prior collisions could have provided. The thrust of Jenkins argument is that it was unfair to prove his behavior was reckless when he was in compliance with state licensing requirements.

The trial court did not abuse its discretion in admitting evidence of Jenkins' prior collisions. The prior collisions were relevant because they demonstrated Jenkins' knowledge through a pattern of accidents. The State had the burden to prove to the jury Jenkins drove realizing the imminence of danger to other motorists. See K.S.A. 21-3201(c). This burden was satisfied by proof of the prior collisions, which Jenkins admitted were caused by seizures.

Jenkins also argues that the trial court erred in failing to instruct the jury as follows:

"It is a defense to the charge made against the defendant if the defendant reasonably believed that his conduct did not constitute a crime and the defendant acted in reliance upon an official interpretation of the statutes, regulations and orders made by an agency legally authorized to interpret such statutes, regulations and orders."

The requested instruction is based in large part on K.S.A. 21-3203(2)(d); however, it differs in one important respect from the statute, which provides in relevant part:

"(2) A person's reasonable belief that his conduct does not constitute a crime is a defense if:

. . . .

"(d) He acts in reliance upon an official interpretation of the statute, regulation or order *defining the crime* made by a public officer or agency legally authorized to interpret such statute." (Emphasis added.)

As the emphasized language in the above quotation shows, the reliance must be on an interpretation of the statute defining the crime. Jenkins' proposed instruction did not require the interpretation to be one defining the crime. The crime in the present case is involuntary manslaughter. The DOR's issuance of a driver's license cannot be considered to be an official interpretation of the

statute defining involuntary manslaughter. On the contrary, the issuance of a driver's license should merely be viewed as the DOR's execution of its administrative duties as directed by Chapter 8 of the Kansas statutes. See K.S.A. 8-234a *et seq*. Thus, Jenkins' proposed instruction was properly rejected by the trial court because it erroneously implied that reliance upon a DOR interpretation of licensing statute would be a sufficient defense.

Further, Jenkins was free to argue that his compliance with the licensing requirements proved that he did not realize the imminence of danger to other motorists. Indeed, this is what his counsel argued in closing arguments:

"And the Department of Revenue, they had all the copies of those six prior accidents. They had that coded into their computer as the law requires them to do. And they submitted this around to the committee, the medical review committees that look at these things and say, Guys, ladies, what do you think? And the State of Kansas said, We think he is safe to drive.

"It is hypocrisy for the State of Kansas to tell him, You may drive, in our opinion it is safe; and then the State of Kansas to come in nine years later and say, What in the world were you thinking? And yet their argument, almost 15 minutes of it, dealt solely with the 1992, the 1993, the Dr. Mandelbaum and all of that."

Later, Jenkins' counsel argued:

"And the State of Kansas maintains—by law they maintain their computer records, and they knew all of this, and they told Mike, You can continue to drive. And every time he submitted one of those forms, he [*sic*] said, You are, in our opinion, safe to drive. And it is wrong for that same State in this courtroom to come in this courtroom and say, Oops, changed our mind, send him away, put him in, second-degree murder, involuntary manslaughter, vehicular homicide, he is a bad guy."·

In a sense, Jenkins would have this court hold that a defendant is not reckless as long as he or she holds a valid license from the State. Jenkins cites no authority for this proposition, and that is not the law. The matter of recklessness was for the jury to decide.

Most importantly, the fiction that the DOR was dealing with correct information provided by Jenkins is rejected. As the State pointed out in its brief on appeal, Jenkins did not provide the DOR with accurate information. The jury also convicted Jenkins in this case of making false information. The DOR in its March 8, 1999, letter continued Jenkins' license "[b]ased on the information pre-

sented." That information, which was signed by Jenkins on February 15, 1999, indicated Jenkins' last "blackout spells, dizzy spells, epilepsy, seizures, loss or alteration of consciousness" was during November 1996. Dr. Hassan's portion of the report confirmed Jenkins had not had an episode since November 1996, based on the information he was provided by Jenkins. During cross-examination, Jenkins admitted the information that he had not had an episode since November 1996 was false:

> "Q. And when you faxed that form to Dr. Hassan's office on March 2nd, 1999, you knew that the information contained on the front part of that form, that the last episode of blackout spells, dizzy spells, epilepsy, seizures, loss or alteration of consciousness was incorrect, didn't you?
> "A. On that date I would have, yes.
> "Q. And you went ahead and you sent that form to Dr. Hassan, didn't you?
> "A. Yes."

Jenkins cannot rely on the actions of the DOR when he was untruthful with the information he provided.

Jenkins cites no authority supporting his requested instruction. His argument that the trial court erred is rejected for the reasons cited above.

## IV. MAKING FALSE INFORMATION

Jenkins argues that the State improperly charged him with the general crime of making false information in light of the more specific crime under K.S.A. 2000 Supp. 8-260(a)(5). "When there is a conflict between a statute dealing generally with a subject and another statute dealing specifically with a certain phase of it, the specific statute controls unless the legislature intended to make the general act controlling. [Citation omitted.]" *State v. Kraushaar*, 264 Kan. 667, 671, 957 P.2d 1106 (1998). "The general rule is that a criminal statute must be strictly construed in favor of the accused, which simply means that words are given their ordinary meaning. Any reasonable doubt about the meaning is decided in favor of anyone subjected to the criminal statute. [Citation omitted.]" *State v. Donlay*, 253 Kan. 132, 134, 853 P.2d 680 (1993).

Jenkins contends he should have been charged with a violation of K.S.A. 2000 Supp. 8-260(a)(5), which provides:

"(a) It shall be unlawful for any person, for any purpose, to:

. . . .

(5) Use a false or fictitious name in any application for a driver's license, or any renewal or replacement thereof, or knowingly conceal a material fact, or otherwise commit a fraud in any such application."

Jenkins was actually convicted of making false information, which is proscribed by K.S.A. 2000 Supp. 21-3711:

"Making false information is making, generating, distributing or drawing, or causing to be made, generated, distributed or drawn, any written instrument, electronic data or entry in a book of account with knowledge that such information falsely states or represents some material matter or is not what it purports to be, and with intent to defraud, obstruct the detection of a theft or felony offense or induce official action."

The State argues that Jenkins' conduct could not have been prosecuted under K.S.A. 2000 Supp. 8-260(a)(5) because the medical forms he completed were not an "application," "renewal," or "replacement thereof" as used in that subsection. Instead, the State claims Jenkins completed the forms in connection with a restriction on his driver's license, for which authority is found at K.S.A. 8-245(a). K.S.A. 8-245(a) provides:

"The division, upon issuing a driver's license shall have authority, whenever good cause appears, to impose reasonable restrictions suitable to the licensee's driving ability with respect to the type of, or special mechanical control devices required on, a motor vehicle which the licensee may operate, or such other restrictions applicable to the licensee as the division may determine to be appropriate to assure the safe operation of a motor vehicle by the licensee."

Jenkins also argues the annual medical reports he was required to provide must have been applications or renewals based upon an interpretation of K.S.A. 2000 Supp. 8-247(e)(7), which provides that "[s]eizure disorders which are controlled shall not be considered a disability." Jenkins quoted the statutory definition of "controlled," leaving out a key phrase which is shown as follows by the emphasized text:

"For the purpose of this paragraph, seizure disorders which are controlled means that the licensee has not sustained a seizure involving a loss of consciousness in the waking state within six months preceding the application or renewal of a driver's license *or whenever a person licensed to practice medicine and surgery*

*in this state makes a written report to the division stating that the licensee's sei-
zures are controlled."* (Emphasis added.) K.S.A. 2000 Supp. 8-247(e)(7).

Thus, Jenkins' argument fails. The definition of "controlled" is not limited to an inquiry of whether there has been a seizure within 6 months of the application or renewal. On the contrary, "controlled" is also defined with reference to a physician's report—a seizure can be the basis for a restriction under K.S.A. 8-245 if not controlled. The italicized language above provides further evidence that the annual medical reports do not fall within the definition of application or renewal, thus making the allegedly "more specific crime" inapplicable to Jenkins' actions.

Since a charge under K.S.A. 2000 Supp. 8-260 would be inappropriate for this case, it was not error to convict Jenkins of making false information under K.S.A. 2000 Supp. 21-3711.

## V. THE DEFENDANT'S DRIVING AND MEDICAL RECORDS

Last, Jenkins argues the trial court erred in allowing the State to use (1) the DOR's records on Jenkins' physical or mental condition; and (2) other medical records.

As stated above, the standard of review for admission of evidence is abuse of discretion. *Lumley*, 266 Kan. at 950. To the extent the analysis requires statutory interpretation, the standard of review is unlimited. *Babe Houser Motor Co. v. Tetreault*, 270 Kan. 502, 506, 14 P.3 1149 (2000).

Jenkins first argues the trial court improperly admitted the DOR's records pertaining to his physical or mental condition. He relies on K.S.A. 2000 Supp. 74-2012(b), which provides in relevant part: "All records of the division of vehicles relating to the physical or mental condition of any person . . . shall be confidential." The parties have not cited and we have not found in our independent research any opinions that have interpreted K.S.A. 2000 Supp. 74-2012.

The State has three responses to the K.S.A. 2000 Supp. 74-2012 argument. First, the records belong to the DOR, not Jenkins; thus, only the DOR has standing to protest a violation of K.S.A. 2000 Supp. 74-2012. Second, the disclosure of the records was necessary to prove the commission of a felony. And third, Jenkins referred

to the facts contained in the records, thus rendering the disclosure not prejudicial.

The statute requires all records relating to a person's physical or mental condition to be confidential. K.S.A. 74-2012(b). One way of approaching this issue is to consider what the legislature meant by making the information confidential and whether the legislature meant for the information to be both confidential *and* privileged. The statutory provisions for the spousal and lawyer-client privileges found at K.S.A. 60-423(b) and K.S.A. 60-426 respectively provide a "privilege" for a communication that is otherwise confidential. "Confidential" means "meant to be kept secret" or "characterized by trust and a willingness to confide in the other." Black's Law Dictionary 294 (7th ed. 1999). "Privilege" means a "special legal right, exemption, or immunity granted to a person or class of persons; an exception to a duty." Black's Law Dictionary 1215 (7th ed. 1999).

Upon further reading of the statute, it becomes clear the section is concerned with the disclosure of the information to third parties. For example, K.S.A. 2000 Supp. 74-2012(c) prohibits the selling of information, presumably to marketers. In this case, the information, while becoming public as a result of the court case, was not directly disclosed to third parties but, instead, used in a court case directly involving Jenkins.

Jenkins argues the legislature's provision of specific exceptions to the general confidentiality rule in K.S.A. 2000 Supp. 74-2012(b) for photographs or digital images should be read to strictly prohibit this court from finding any further exceptions. While this is a strong argument, the court must also interpret a statute in such a way as to carry out the legislative intent:

> "It is a general rule of construction that the courts have no authority to create, and will not create, exceptions to the provisions of a statute not made by the act itself. Where the legislature has made no exception to the positive terms of a statute, the presumption is that it intended to make none. No rule of public policy is available to create exceptions to a statutory rule. It is especially true that the power to create exceptions may not be exercised where the words of the statute are free from ambiguity.
>
> "On the other hand, there are some cases in which exceptions to the general provisions of a statute may be implied by the courts, such as where the exceptions

are necessary to give effect to the legislative intent. Of course, exceptions must appear plainly from the express words or necessary intendment of the statute." 73 Am. Jur. 2d, Statutes § 213.

Assuming the DOR violated K.S.A. 2000 Supp. 74-2012, the remaining issue is the remedy for this case. The question becomes whether it was the legislative intent to shelter a person submitting medical forms with false information from prosecution under K.S.A. 2000 Supp. 74-2012. The State argues the information belongs to the DOR and only the DOR has standing to complain of a violation. Jenkins seems to assume any violation of K.S.A. 2000 Supp. 74-2012 requires a reversal of his conviction. Neither party cited authority to support their respective positions. "[E]rrors that do not affirmatively cause prejudice to the substantial rights of the complaining party do not require reversal when substantial justice has been done." *State v. Clark*, 263 Kan. 370, 376, 949 P.2d 1099 (1997). The purpose of the confidentiality rule in K.S.A. 2000 Supp. 74-2012(b) must be to encourage the honest disclosure of medical information, not to protect a person from submitting false information. Jenkins did not have a substantial right to submit false information, and the error in admitting the records, if there was one, was harmless.

Jenkins also argues the trial court erred in admitting his medical records produced by Dr. Hassan. Jenkins concedes our state law does not prohibit the use of such records, but argues the trial court violated federal statutes and regulations. The federal law cited, 42 U.S.C. 290dd-2(a) (1994) provides in relevant part:

"(a) Requirement. Records of the identity, diagnosis, prognosis, or treatment of any patient *which are maintained in connection with the performance of any program or activity relating to substance abuse education, prevention, training, treatment, rehabilitation, or research* . . . shall . . . be confidential and be disclosed only for the purposes and under the circumstances expressly authorized under subsection (b) of this section." (Emphasis added.)

Beyond pointing out that Dr. Hassan admitted in testimony that his clinic was a "federal medical provider" Jenkins does not explain how his involvement with Dr. Hassan was related to substance abuse; thus, the federal law appears inapplicable in this case.

However, assuming that the federal statute was applicable and that it was violated—what is the proper remedy? The Supreme Court of Montana, in a divided opinion, held that the fine contemplated in 42 U.S.C. § 4582(f) (1970), which has been transferred and replaced by 42 U.S.C. § 290dd-2(f) (1994), was the sole remedy, not suppression of the evidence:

"The fact that a remedy is provided in the legislation indicates that Congress considered the possibility of a violation and determined the appropriate remedy for that violation. If Congress had intended that suppression and dismissal were the appropriate remedies for a violation of a confidentiality it would have so provided." *State v. Magnuson*, 210 Mont. 401, 408, 682 P.2d 1365 (1984).

The court did not err in admitting Jenkins' driving and medical records.

Affirmed.

DAVIS, J., not participating.

BRAZIL, Chief Judge Retired, assigned.