NOT DESIGNATED FOR PUBLICATION

No. 126,714

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee,*

v.

RIGO OLIVER PHINNEY,
*Appellant.*

MEMORANDUM OPINION

Appeal from Shawnee District Court; MABAN WRIGHT, judge. Submitted without oral argument. Opinion filed November 7, 2025. Affirmed.

*Ryan J. Eddinger*, of Kansas Appellate Defender Office, for appellant.

*Carolyn A. Smith*, assistant deputy district attorney, *Michael F. Kagay*, district attorney, and *Kris W. Kobach*, attorney general, for appellee.

Before WARNER, C.J., ATCHESON and ISHERWOOD, JJ.

PER CURIAM: Rigo Oliver Phinney stands convicted of two counts of involuntary manslaughter and one count of reckless driving as a result of conduct that took the lives of two motorcycle riders. He brings this appeal contending that the State failed to offer sufficient evidence of wantonness that he alleges was required to establish the mens rea for each charged offense. The legal authority that Phinney relies on as the foundation for his claim that involuntary manslaughter requires proof of wanton conduct is outdated, however, and does not provide an avenue of relief. Rather, under the current involuntary manslaughter statute, recklessness is sufficient to secure a conviction. Following a

1

thorough review of the evidence in a light most favorable to the State, we are satisfied there was sufficient evidence offered at trial to enable a reasonable jury to conclude that Phinney was guilty beyond a reasonable doubt of the charged offenses. Accordingly, his convictions are affirmed.

FACTUAL AND PROCEDURAL BACKGROUND

Anthony Vardys, along with his son, Dillon, formed the Midwest Brotherhood Motorcycle Club (MWB), a family-oriented organization that enabled individuals to share their hobby with and enjoy the camaraderie of like-minded riders. Motorcycle riding was a big part of the members' lives, so they rode together as often as their schedules allowed and organized fundraisers for charitable causes in their community.

On the evening of March 20, 2021, approximately 10 MWB members attended an open house sponsored by another area riding club. The MWB group left the event around 10 p.m. to return to Topeka via Highway 24, adopting their standard zipper formation within a single lane, wherein the riders alternated from left to right but not directly adjacent to one another. The posted speed limit was 55 miles per hour, and the group generally maintained a speed between 52 and 60 miles per hour. As the riders made their way into town, they crested the top of a hill and began their descent into a flat stretch of highway that was flanked on both sides by an access road and businesses.

Around this same time, Phinney was helping his roommate, Randy Clelland, resolve a problem with his work truck. Clelland's large white utility truck broke down near the intersection of Highway 24 and Meriden Road, and Phinney agreed to help tow it with his black passenger pickup truck. Clelland attached a roughly 30-foot-long standard metal chain between the two trucks but they neglected to affix any flags to the chain to ensure that connection was visible. The plan was for Phinney to perform the towing

2

function with his own truck while Clelland assisted by steering the incapacitated truck. Both trucks had their headlights on, but the drivers did not activate their hazard lights.

Around this time, Phinney and Clelland's other roommate, Melissa Britton, arrived at the scene. Britton was riding as a passenger in a car driven by Jeramie Lamm when she recognized her roommates' trucks and told Lamm to stop so they could help. Lamm turned on his hazard lights and took up a position behind the two trucks. The vehicles made their way onto the access road north of Highway 24 and headed west. They eventually turned onto the eastbound lanes of Highway 24 and proceeded until they reached the intersection of Highway 24 and Meriden Road, where they pulled into the median and prepared to turn left onto Meriden Road.

After oncoming traffic passed, Phinney started to turn but quickly realized that the chain had fallen off so he backed up and Clelland reattached the chain. After Clelland performed that task, Phinney scanned the westbound highway lanes for oncoming traffic and noticed the glow emanating from the MWB riders' LED headlights as they cleared a hill. He started across the intersection, and when he looked again, the motorcycles were closing in on the bottom of the hill. Phinney observed the motorcycles approaching in the westbound lanes but, more concerned with getting the trucks across Highway 24 and onto northbound Meriden Road than honoring the yield sign which established that the motorcycles had the right-of-way, Phinney continued to cross the intersection.

Despite their short window of time, the pair of trucks was moving slowly because Clelland had to maintain pressure on the truck's brakes to ensure the chain remained taut so it would not fall off again. As the motorcycles drew closer, their headlights gradually illuminated the pair of trucks in the median and when the group was roughly a few hundred yards away, they saw Phinney start to enter the highway. Uncomfortable with how close they were to the intersection when Phinney moved forward, the bikers let off their throttles to slow down. It was not until they were approximately 50 yards from the

3

intersection that the bikers realized the trucks were connected. Attempting to prevent a collision, they hit their brakes, signaled to each other to slow down, and took evasive maneuvers.

Phinney yelled to himself, "Come on, come on, come on" as the motorcycles bore down on the trucks. He made it across the highway lanes onto Meriden Road, but the bed of Clelland's truck was still in the right lane of the highway when the bikers reached the intersection. Britton, watching from the car in the median, realized that a collision was inevitable.

The bikers on the left side of the staggered formation managed to skirt around the back of the second truck and those in the rear of the formation were able to stop before they reached the second truck. Unfortunately, Anthony Vardys and his wife, Tamara, who were riding the first motorcycle on the right side of the formation collided with the second truck with a significant degree of force and both were thrown from the bike. Tamara's body violently struck the side of the truck, and she died at the scene. Anthony was projected over it and landed on the pavement. He died at the hospital later that evening.

Phinney was charged with two counts of involuntary manslaughter, eight counts of endangerment, two counts of improper towing, and one count each of reckless driving, driving while suspended, driving without insurance, and failure to yield. Following a jury trial, the district court entered a judgment of acquittal for one count of improper towing and he was found guilty on all remaining counts, with the exception of driving without insurance. Phinney was sentenced to serve a total term of 44 months' imprisonment.

Phinney now brings his case before this court to determine whether the State presented sufficient evidence at trial to prove beyond a reasonable doubt that he possessed the requisite mental states for involuntary manslaughter and reckless driving.

4

LEGAL ANALYSIS

*Whether Phinney's knowledge of the risks associated with the circumstances satisfies the requisite mental state for convictions of involuntary manslaughter and reckless driving*

Phinney contends that his convictions for involuntary manslaughter and reckless driving must be reversed. The crux of his argument is that the State's evidence was insufficient to prove a mens rea element common to both involuntary manslaughter and reckless driving, i.e., wanton conduct or gross negligence. On appeal, we are tasked with resolving those two evidentiary challenges: first, the sufficiency of the evidence for Phinney's involuntary manslaughter convictions; and second, for reckless driving.

The State takes the position that wanton conduct or gross negligence is not an element of K.S.A. 2020 Supp. 21-5405(a)(1), the involuntary manslaughter statute. According to the State, to support a conviction under K.S.A. 2020 Supp. 21-5405(a)(1), it only needs to show that Phinney acted recklessly. The State argues that it presented sufficient evidence at trial to enable a reasonable jury to conclude beyond a reasonable doubt that Phinney acted recklessly in support of the involuntary manslaughter convictions, and willfully or wantonly in support of the reckless driving conviction.

*Standard of Review*

When a defendant challenges the sufficiency of the evidence in a criminal case, this court reviews "'the evidence in a light most favorable to the State to determine whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt. An appellate court does not reweigh evidence, resolve conflicts in the evidence, or pass on the credibility of witnesses.'" *State v. Aguirre*, 313 Kan. 189, 209, 485 P.3d 576 (2021). Reversal of a guilty verdict is warranted "only when the testimony is so incredible that no reasonable fact-finder could find guilt beyond a reasonable doubt," thereby establishing a low burden for the State. *State v. Stuart*, 319 Kan. 633, 635, 556

5

P.3d 872 (2024); *State v. Meggerson*, 312 Kan. 238, 247, 474 P.3d 761 (2020). Still, "once insufficiency is determined, it is not toothless." *Stuart*, 319 Kan. at 635.

A. *Involuntary Manslaughter*

A jury found Phinney guilty of two counts of involuntary manslaughter pursuant to K.S.A. 2020 Supp. 21-5405(a)(1), which defines involuntary manslaughter as the killing of a human being committed "[r]ecklessly." To guide the jurors in their understanding of the involuntary manslaughter statute in the first count, the district court set forth jury instructions that provided:

> "To establish this charge, each of the following claims must be proved:
> 1. The defendant killed Anthony Vardys.
> 2. The killing was done recklessly.
> 3. This act occurred on or about the 20th day of March, 2021, in Shawnee County, Kansas.

> "A defendant acts recklessly when the defendant consciously disregards a substantial and unjustifiable risk that certain circumstances exist or a result of the defendant's actions will follow. This act by the defendant disregarding the risk must be a gross deviation from the standard of care a reasonable person would use in the same situation.

> "The fault or lack of fault of Anthony Vardys is a circumstance to be considered along with all the other evidence to determine whether the defendant's conduct was or was not the direct cause of Anthony Vardys's death."

The instruction for the second count was identical to the first, except Tamara's name replaced Anthony's.

On appeal, Phinney argues that a conviction for involuntary manslaughter requires finding that a defendant's conduct was wanton or grossly negligent. The State counters that recklessness is the requisite mens rea for the offense. Consequently, the first issue we must resolve is the precise mental state the prosecution is required to prove to sustain a conviction for involuntary manslaughter.

The involuntary manslaughter statute clearly and unambiguously establishes that the requisite mental state for the crime is recklessness. K.S.A. 2020 Supp. 21-5405(a)(1) (defining the offense as the reckless killing of a human being). The Legislature has provided that "[a] person acts 'recklessly' or is 'reckless,' when such person consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." K.S.A. 2020 Supp. 21-5202(j).

Phinney's argument that involuntary manslaughter requires wanton conduct or gross negligence is unpersuasive, given that it is grounded in outdated legal authority. Specifically, Phinney relies on *State v. Choens*, 224 Kan. 402, 580 P.2d 1298 (1978), and *State v. Makin*, 223 Kan. 743, 576 P.2d 666 (1978). When *Choens* and *Makin* were decided in 1978, the involuntary manslaughter statute was codified under K.S.A. 21-3404 (Weeks 1974) and provided:

> "'Involuntary manslaughter is the unlawful killing of a human being, without malice, which is done unintentionally in the commission of an unlawful act not amounting to felony, or in the commission of a lawful act in an unlawful or wanton manner. As used in this section, an "unlawful act" is any act which is prohibited by a statute of the United States or the state of Kansas or an ordinance of any city within the state which statute or ordinance is enacted for the protection of human life or safety.'" *Makin*, 223 Kan. at 744.

7

The 1978 version of the involuntary manslaughter statute differs significantly from its 2020 counterpart. Unlike K.S.A. 2020 Supp. 21-5405(a)(1), under which Phinney was charged, the 1978 statute does not include the term "recklessly" in its definition. That language was introduced by the Legislature in 1992. L. 1992, ch. 298, § 6. Nearly two decades later, the 2010 Kansas Criminal Code recodification further revised the statute. L. 2010, ch. 136, § 40. Since the recodification, involuntary manslaughter has been defined as the killing of a human being committed *recklessly*. K.S.A. 21-5405(a)(1).

Even more importantly, since 1978, the Legislature has amended the definitions of the various culpable mental states several times. Initially, in 1978, wanton conduct was sufficient to establish the requisite mental state for involuntary manslaughter and was defined as:

> "'conduct done under circumstances that show a realization of the imminence of danger to the person of another and a reckless disregard or complete indifference and unconcern for the probable consequences of such conduct. The terms "gross negligence," "culpable negligence," "*wanton negligence*" *and* "*recklessness*" *are included within the term* "*wantonness*" as used in this Code.'" (Emphasis added.) *Makin*, 223 Kan. at 745-46.

In 1993, the Legislature redefined the culpable mental states for criminal liability. The revised definition provided:

> "Reckless conduct is conduct done under circumstances that show a realization of the imminence of danger to the person of another and a conscious and unjustifiable disregard of that danger. The terms 'gross negligence,' 'culpable negligence,' 'wanton negligence' and 'wantonness' *are included within the term 'recklessness'* as used in this code." (Emphasis added.) K.S.A. 1993 Supp. 21-3201(c).

Finally, the statute was again modified as part of the comprehensive criminal code recodification to adopt what still stands as the current version:

"A person acts 'recklessly' or is 'reckless,' when such person consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." K.S.A. 21-5202(j); L. 2010, ch. 136, § 13.

Over the course of four decades—from 1978 to 2020—the Kansas Legislature phased references to "wanton" conduct out of the statute and placed a greater emphasis on "reckless" conduct. Compare K.S.A. 21-3201(3) (Weeks 1974), with K.S.A. 2020 Supp. 21-5202(j). This shift signals a legislative intent to retire "wantonness" as a requisite standard. Compare K.S.A. 21-3404 (Weeks 1974), with K.S.A. 2020 Supp. 21-5405. Consequently, the 1978 phrase "in the commission of a lawful act in an unlawful or wanton manner" no longer reflects the culpable mens rea for involuntary manslaughter. See K.S.A. 21-3404 (Weeks 1974) (defining involuntary manslaughter as "the unlawful killing of a human being, without malice, which is done unintentionally . . . in the commission of a lawful act in an unlawful or wanton manner"). Accordingly, when Phinney decided to cross Highway 24 in 2021, "[r]ecklessly" was the threshold mens rea the State was required to prove for involuntary manslaughter. K.S.A. 2020 Supp. 21-5405(a)(1).

A somewhat illustrative case for comparing an earlier version of a statute with its later counterpart is *State v. Coleman*, 311 Kan. 305, 311-16, 460 P.3d 368 (2020). That case involved a comparison of statutes for purposes of conducting the "identical-or-narrower test" articulated in *State v. Wetrich*, 307 Kan. 552, Syl. ¶ 3, 412 P.3d 984 (2018). *Coleman*, 311 Kan. at 306. Coleman argued that the absence of the term "or wanton" from the 2015 version of the involuntary manslaughter statute rendered it narrower than the 1992 version. *Coleman*, 311 Kan. at 311-12. In rejecting Coleman's argument, the court observed that what constituted killings resulting from wanton conduct in 1992—either during lawful or unlawful activity—was now criminalized as "reckless" killings under the 2015 version. 311 Kan. at 316. The former was absorbed by

9

the latter and there is not a distinction to be drawn between them. Accordingly, *Coleman* reinforces the conclusion that Phinney's reliance on *Choens* and *Makin* is misplaced.

*State v. Hill*, 33 Kan. App. 2d 907, 111 P.3d 178 (2005), is also worthy of mention. In that case, Hill similarly challenged the sufficiency of the evidence regarding the mens rea element of involuntary manslaughter. His conviction stemmed from an incident in which he fell asleep at the wheel of a semitrailer truck then struck and killed a road construction worker. A witness driving behind Hill testified that Hill's truck veered erratically onto the shoulder and back into the driving lane repeatedly for over nine miles prior to the collision. After the accident, Hill was diagnosed with sleep apnea. 33 Kan. App. 2d at 907-08, 912.

On appeal, Hill argued that because there was no evidence showing he realized the imminence of danger prior to the accident, his acts were not properly classified as "reckless." *Hill*, 33 Kan. App. 2d at 911. The court compared Hill's case to *State v. Jenkins*, 272 Kan. 1366, 1375, 39 P.3d 47 (2002), which discussed how a motorist who has a seizure would not be acting recklessly if a seizure had not previously occurred and surprised them. *Hill*, 33 Kan. App. 2d at 911-12. This court disagreed with Hill's contention and found: "The evidence of recklessness can be inferred from [the witness]'s testimony that Hill drove erratically for over 9 miles. A reasonable person could infer that Hill must have been aware that he was dozing at the wheel." 33 Kan. App. 2d at 913. His unpredictable driving, repeatedly "swerv[ing] out of his lane and then attempt[ing] to correct himself," demonstrated that "he was having a difficult time staying awake and alert," so "he must have known that he was posing a danger to others on the road but he continued ahead rather than pulling over." 33 Kan. App. 2d at 913.

Just as erratic driving in *Hill* reflected a conscious disregard for a known risk, the chain's detachment from the white truck similarly illustrates Phinney's awareness and dismissal of a known risk. Viewing the evidence in the light most favorable to the State, a

10

rational factfinder could conclude that Phinney acted recklessly. First, in his police interview after the collision, Phinney could be viewed as having questioned the group's plan, by stating he stopped to ask Clelland after beginning to tow, "Are you sure you want to take it to the house?" Regardless of any reservations, Phinney continued towards the highway.

Next, the chain connecting the two trucks detached while they were in the median of Highway 24, and Phinney reversed his truck and waited while Clelland quickly resecured the chain. Then, as Sergeant Justin Joyce testified—and as the yield sign at the intersection established—Phinney was obligated to yield the right-of-way to the approaching motorcycles. Nonetheless, according to Phinney, despite seeing the glow of the bikers' headlights on the horizon and knowing that his group was moving precariously across the intersection, he pressed on the gas as hard as he could, and when he looked again, he saw the oncoming bikers coming down the hill and began pleading to himself "[c]ome on, come on, come on" in the hope of clearing the riders' path of travel.

Additionally, Phinney should have known that the bed of the towed truck might be difficult to see at night as he was not using his hazard lights, nor did he secure any flags or reflective markers to the unstable tow chain that linked the two trucks together. Moreover, Phinney did not need to cross at that intersection; an alternative route was available. By proceeding across the highway under these conditions, Phinney consciously disregarded a substantial and unjustifiable risk that an accident would follow.

In rejecting Phinney's motion for judgment of acquittal, the district court stated:

> "Judgment of acquittal is appropriate only when conviction results from insufficient evidence. Here, a reasonable juror could conclude, beyond a reasonable doubt, that Mr. Phinney saw the motorcycles approaching but continued with his jury-rigged towing operation anyway, in violation of applicable traffic laws and gross

11

disregard for the safety of approaching traffic. Given the applicable standards here, the jury's finding of criminal recklessness is supported by sufficient evidence. Judgement of acquittal in Counts I and II is denied."

No portion of the district court's statement is erroneous. The record reflects that the State presented sufficient evidence to enable a reasonable jury to conclude beyond a reasonable doubt that Phinney acted recklessly, thereby supporting the convictions for involuntary manslaughter.

### B. *Reckless Driving*

The State also charged Phinney with one count of misdemeanor reckless driving under K.S.A. 2020 Supp. 8-1566(a). That statute provides: "[a]ny person who drives any vehicle in willful or wanton disregard for the safety of persons or property is guilty of reckless driving." K.S.A. 2020 Supp. 8-1566(a).

At trial, the jury returned a guilty verdict, consistent with the language set forth in the jury instructions, which stated:

"To establish this charge, each of the following claims must be proved:
1. The defendant was driving a vehicle.
2. The defendant was driving in willful or wanton disregard for the safety of persons or property.
3. This act occurred on or about the 20th day of March, 2021, in Shawnee County, Kansas.

"The term wanton means driving under circumstances that show a realization of the imminence of danger to another person or the property of another where there is a conscious and unjustifiable disregard of that danger."

As previously discussed, the Legislature last provided a definition for "wanton" in 1992, before the term was fully replaced with "reckless" in 2011. The definition of reckless conduct in 1993 included wantonness, and featured language nearly identical to the definition of wanton in the jury instructions: "Reckless conduct is conduct done *under circumstances that show a realization of the imminence of danger to the person of another* and *a conscious and unjustifiable disregard of that danger*." (Emphases added.) K.S.A. 1993 Supp. 21-3201(c); see *State v. Remmers*, 278 Kan. 598, 600, 102 P.3d 433 (2004). The jury instruction is therefore in accordance with the most recent statutory definition of "wanton."

Although the statutory offense is labeled "reckless" driving, both the statute and jury instructions establish that the requisite culpable mental state is one of willful or wanton disregard. The use of both terms—"reckless" and "wanton"—is a vestige of the historical shift in statutory language. When the Legislature last amended the reckless driving statute, K.S.A. 8-1566, in 1989, it considered these terms synonymous. See K.S.A. 21-3201(3) (Ensley 1988) ("The terms 'gross negligence,' 'culpable negligence,' 'wanton negligence' and 'recklessness' are included within the term 'wantonness' as used in this code."). As a result, the reckless driving statute utilizes both terms, i.e., "reckless" and "wanton," even though the criminal code no longer defines "wanton."

The Kansas Supreme Court's decision in *Remmers* is instructive. In that case, Remmers failed to stop at a rural intersection and collided with a service truck. The court found that his conduct stemmed solely from inattentiveness. That is, he lacked a realization of imminent danger to others and failed to exhibit any "conscious and unjustifiable disregard of that danger." 278 Kan. 598, Syl. ¶ 3. Under those facts, the evidence was insufficient to support a conviction for reckless driving.

In arriving at its conclusion, the *Remmers* court relied on its earlier decision in *State v. Huser*, 265 Kan. 228, 234-35, 959 P.2d 908 (1998), which clarified that a

13

conviction for driving under the influence does not, by itself, establish "'reckless disregard for the safety of others.'" *Remmers*, 278 Kan. at 600. As stated in *Huser*: "'One's behavior is only reckless *if he or she realizes that his or her conduct creates imminent danger to another person but consciously and unjustifiably disregards the danger*. K.S.A. 21-3201(c) (defining reckless conduct).'" *Remmers*, 278 Kan. at 601.

As further explanation, the *Remmers* court also cited *State v. Krovvidi*, 274 Kan. 1059, 58 P.3d 687 (2002), where it held that "running a red light as a result of inattentiveness, standing alone, did not satisfy the element of material deviation from the standard of care required for vehicular homicide." *Remmers*, 278 Kan. at 601.

Based on these precedents, the court in *Remmers* framed its analysis around the principle that mere inattentiveness is insufficient to support a finding of recklessness. 278 Kan. at 600-02. Remmers' contention that "something more than evidence of inattentive driving is required" to establish reckless driving was consistent with the court's interpretation of the statutory standard. 278 Kan. at 599. After noting that Remmers was "driving on a rural road on a clear day" and "[t]here was no evidence of speeding, swerving, driving erratically, or leaving the scene," the facts failed to bear out the "something more" that was required to sustain his conviction. 278 Kan. at 599, 602. Specifically, there was no "[e]vidence of defendant's mental state or aggravating circumstances." 278 Kan. at 602.

Unlike in *Remmers*, the record here contains evidence of Phinney's mental state at the time of the collision. Despite the knowledge that the chain could slip unpredictably, that it lacked reflective or visible markers, and the close proximity of the riders, Phinney pulled out in front of the approaching bikers, yelling to himself, "Come on, come on, come on." This conduct reflects a conscious disregard of a known and imminent risk, rather than mere inattention. The likelihood of an accident was not speculative, it was apparent.

14

Reviewing the evidence in a light most favorable to the State, a rational juror could have found Phinney guilty of reckless driving beyond a reasonable doubt.

The State presented sufficient evidence of recklessness at trial to enable a reasonable jury to conclude that Phinney was guilty beyond a reasonable doubt of involuntary manslaughter and reckless driving. Accordingly, his convictions are affirmed.

Affirmed.