No. 85,222

STATE OF KANSAS, *Appellee*, v. ARLANDO TOLSON, *Appellant*.

(56 P.3d 279)

Opinion filed October 25, 2002.

*Darla J. Lilley*, of Lawrence, argued the cause and was on the brief for appellant.

*W. Scott Toth*, assistant district attorney, argued the cause, and *Steven J. Obermeier*, assistant district attorney, *Paul J. Morrison*, district attorney, and *Carla J. Stovall*, attorney general, were on the brief for appellee.

The opinion of the court was delivered by

ALLEGRUCCI, J.: Arlando Tolson was convicted by a jury of shooting Austin Garza during a drug transaction. Tolson appeals his conviction of felony murder. Tolson raises two issues on appeal:

1. Was it error for evidence of Tolson's prior criminal acts to be admitted pursuant to K.S.A. 60-455?

2. Did the trial court err by denying Tolson's motion to suppress evidence seized after issuance of a search warrant from his resi-

dence, which earlier had been entered without a warrant by police officers looking for Tolson?

On September 15, 1999, Austin Garza (referred to hereafter as Garza, to be distinguished from Ector Garza) bled to death as a result of a gunshot wound to his right leg that severed the femoral artery. An eyewitness identified Tolson as the gunman, and another witness placed Tolson with Garza at the time of the shooting.

Approximately a week before Garza was shot, Tolson and two other men were in the neighborhood where Garza lived. They asked 16-year-old Randall Simmons where they could find a woman named Mae. Simmons took the men to the apartment of Halley Stephenson, who knew Mae. Tolson told Simmons that he was looking for 20 pounds of marijuana. Later, after the men had gone, Simmons told Stephenson that Tolson was looking for a large quantity of marijuana. Simmons contacted Garza, who lived a couple of houses away from Stephenson. Garza said that he would try to find some, and later he told Simmons that he had 20 pounds he could sell. Simmons contacted Tolson.

Tolson was going to pay Garza $13,500 for the 20 pounds of marijuana. Garza was going to give Simmons $1,500.

On September 15, 1999, Simmons went to Garza's residence and called Tolson to tell him to come over and pick up the marijuana. After Simmons made the call, Garza's cousin, Ector Garza, showed up. Tolson arrived in a black Corvette. Garza, Simmons, and Tolson went downstairs, and Garza showed the marijuana to Tolson. Simmons saw approximately 20 packaged "bricks" of marijuana. Simmons got a trash bag from a closet in the upstairs hallway. Tolson put the marijuana in the trash bag and started up the stairs. Tolson told Garza that his money was in a box in his car.

Garza and Tolson went outside. Garza told Simmons to stay inside. When he heard the vehicle start, Simmons looked out a window. Tolson and Garza were struggling and pulling on something. Tolson was in the driver's seat; Garza was on the passenger side with the door partly opened. Simmons heard a gunshot. Garza fell back. Simmons ran out the back door.

From her living room window, Stephenson was approximately 20 feet away and could look directly through the windshield of the Corvette Tolson was driving. She saw Tolson leave Garza's residence carrying a black trash bag with Garza following him. She saw Tolson get into the car, put the bag in the middle, and start the engine. Garza got part way in the car on the passenger side. He and Tolson engaged in a tug of war with the trash bag. Tolson pulled out a gun with his right hand, aimed it between Garza's hips and knees, and fired one shot. Garza got out of the vehicle, and Tolson sped away toward the 87th Street exit off of Noland Road.

A bystander saw a black male driving a black Corvette with Missouri license plate number 072 KJH away from the area where Garza was shot. The Corvette was being driven north on Noland Road in Lenexa, Kansas, at a high rate of speed.

The Missouri license plate number was broadcast, and several officers spotted and pursued the vehicle. The dispatcher informed officers that a vehicle matching the description had been seen southbound on Antioch Road crossing over I-435 at approximately 100 miles per hour. The vehicle was seen going through a red light at or near 119th and Nall Avenue. The vehicle was leaving a smoky haze hanging in the air along its entire route. Using the haze and confirming tips from bystanders, the Lenexa officers followed the vehicle into Missouri. At a ramp that was barricaded for construction, the officers were told by another driver that the black Corvette struck the barricades and drove north on the closed road.

A Kansas City, Missouri, helicopter and investigative units were in the area looking for the vehicle. A Kansas City, Missouri, police officer found the Corvette parked behind a residence at 8118 Paseo. It had scuff marks on the front that were consistent with the car striking a barricade. While some officers surrounded the residence to prevent the suspect's escape, others conducted a "sweep" of the interior of the residence to see if the suspect was inside. He was not in the house.

When a search warrant was obtained for the premises at 8118 Paseo, officers found clothing on the floor that appeared to have been left by someone hurriedly changing clothes. There was a framed photograph of Tolson and two children on a table. A large

trash bag found on the dining room floor contained individually wrapped "bricks" of a green, leafy substance that proved to be marijuana. The bag contained 20 bricks, which equaled approximately 20 pounds of marijuana. Fingerprints found on the plastic bags matched those of Tolson and Garza. A Tupperware container with plastic baggies of a rock-like substance was found in the kitchen area. A Smith and Wesson .40 caliber handgun was recovered from the bedroom. There was a bullet in the chamber and additional ammunition for the gun.

A search of the black Corvette revealed that a bullet had gone into the inside of the car door just below the armrest, hit a bracket, and ricocheted into a little storage compartment. The bullet was retrieved by opening the storage compartment. It was a .38 caliber bullet, which could have been fired by a Smith and Wesson revolver or semiautomatic pistol.

Tolson first argues that it was error for evidence of his prior criminal acts to be admitted pursuant to K.S.A. 60-455. The trial court granted the State's pretrial motion to admit evidence of specified prior criminal acts. Although Tolson complains on appeal that the trial court admitted evidence of prior criminal acts, his record references are to the transcript of the pretrial proceedings on the State's motion rather than to the trial transcript.

In its brief, the State discusses trial testimony about two prior criminal acts that were included among those listed in the State's pretrial motion. Officers Devalkanere and Jennings testified that they were involved in the April 1997 arrest of Tolson in a hotel in Joplin, Missouri. Officer Cook testified that she made a controlled buy of crack cocaine from Tolson in Kansas City, Missouri, in December 1992. Each witness' testimony was admitted over the defendant's objection. The jury was instructed to limit its consideration of the evidence to proof of the defendant's motive, plan, and knowledge.

April 1997. Devalkanere was assigned to the fugitive apprehension unit of the Kansas City, Missouri, police department. In 1997, Tolson was a target of Devalkanere's unit and was tracked to a hotel in Joplin, Missouri. Tolson, who was alone, was arrested in a room in the hotel. Objects recovered from the hotel room included

a 9 mm. handgun with a round in the chamber and six rounds in the magazine, an electronic scale, a small bag of what appeared to be marijuana seeds, razor blades, plastic sandwich bags, and two neat stacks of cash—one containing $1000, the other containing $703. Jennings testified that the seized items indicated drug activity.

December 1992. Cook worked as an undercover narcotics officer in Kansas City, Missouri. Acting on information obtained from surveillance and informants, she went to apartment 708 at 300 East Armour Road. Cook was admitted to the apartment by Teresa White, who made Cook raise her shirt in order to check for a wire. Tolson was there. Cook asked for a "20," which is a $20 "rock" of crack cocaine. Tolson removed from his coveralls pocket a baggie that contained several "rocks" of crack cocaine. He removed two and handed them to White, who kept one and handed the other to Cook. Cook paid with a $20 bill whose serial number had been recorded. Tolson told Cook to come in the back door the next time, and White told her not to bring the police. Later, when defendant was arrested, Cook's $20 bill was found on him along with a loaded semiautomatic handgun and an additional clip for the gun. Crack cocaine, marijuana, and razor blades were found in the apartment. Cook testified that the evidence showed that narcotics were being sold from the apartment.

K.S.A. 60-455 provides:

"Subject to K.S.A. 60-447 evidence that a person committed a crime or civil wrong on a specified occasion, is inadmissible to prove his or her disposition to commit crime or civil wrong as the basis for an inference that the person committed another crime or civil wrong on another specified occasion but, subject to K.S.A. 60-445 and 60-448 such evidence is admissible when relevant to prove some other material fact including motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident."

In this case, the State urged and the trial court found that the evidence of prior criminal acts was relevant to prove motive, plan, and knowledge on the part of the defendant. The trial court stated that it was

"struck by the similarity here between the prior instances and the events of the Complaint where the defendant has involved himself in drug transactions and has

been fully armed, well-armed, and prepared for problems in connection with the drug sale or transaction, which is certainly the allegation in this case."

Our Supreme Court has stated:

"There are three requirements which must be satisfied for evidence to be admitted under K.S.A. 60-455. The trial court must find that '(1) the evidence is relevant to prove one of the facts specified in the statute; (2) the fact is a disputed, material fact; and (3) probative value of the evidence outweighs its potential prejudice.' *State v. Lane*, 262 Kan. 373, 388, 940 P.2d 422 (1997)." *State v. Rucker*, 267 Kan. 816, 824, 987 P.2d 1080 (1999).

If the requirements for admission of evidence of prior crimes pursuant to K.S.A. 60-455 are met, the scope of appellate review is limited to whether the trial court abused its discretion. *State v. Lane*, 262 Kan. 373, 388, 940 P.2d 422 (1997).

Tolson was charged with felony murder. The complaint states that Tolson shot and killed Garza with a handgun in the commission of or attempt to commit or flight from an inherently dangerous felony, sale of marijuana, which includes possession of marijuana with the intent to sell, deliver, or distribute it. See K.S.A. 21-3401; K.S.A. 2001 Supp. 65-4163(a)(3). Sale of marijuana is a statutory inherently dangerous felony. K.S.A. 21-3436(a)(14). Thus, the State was required to prove that Tolson killed Garza while committing, attempting to commit, or flight from the felony of possessing a substantial quantity of marijuana.

Plan. The trial court adopted the State's argument, which would make the evidence of Tolson's prior criminal acts relevant to show that his modus operandi was to have a loaded handgun available while engaging in drug transactions. The State relied on *State v. Damewood*, 245 Kan. 676, 783 P.2d 1249 (1989), in which the court described "modus operandi" as the "general method used by a defendant to perpetrate similar but totally unrelated crimes." 245 Kan. at 682. Damewood's method was to interest boys in his beekeeping, which allowed him to be alone with them so that he could sexually molest them. The court found no error in the admission of the testimony of a young man who had been drawn into beekeeping by Damewood and then sexually abused several years before the victim of the charged crime became involved with Damewood. 245 Kan. at 682.

In *Damewood*, there was a method of operation, and it was so distinct as to be a "signature." Damewood was being tried for arranging to spend time alone with a boy by involving the boy in his beekeeping activities and then sexually molesting him. Precisely the same pattern of conduct or method of operation was shown by the prior acts evidence to have been followed on a previous occasion.

This case does not present such a clear picture. The method of operation, as determined by the trial court, was Tolson's having a loaded handgun during drug transactions. Compared to the pattern of conduct in *Damewood*, there is very little method or operation involved in having a loaded handgun during illegal drug transactions. Moreover, even if having a loaded handgun during drug transactions can be said to amount to a method of operation, there is nothing very surprising in a drug dealer having a loaded weapon, so evidence that he had a gun on previous occasions has little tendency to prove that he did during the transaction with Garza. In addition, the similarity between Tolson's conduct on previous occasions and his conduct during the transaction with Garza is not great. The evidence was that, when Tolson was arrested in the Joplin hotel room, there was a loaded handgun in the room. When he was arrested in an apartment for selling crack cocaine, he had a loaded handgun on his person. In neither instance did he fire the gun. In the present case, he fired a gun that seems to have been in his vehicle. Stephenson testified that Tolson and Garza were in the car in a tug of war with the trash bag of marijuana when "all of a sudden [Tolson] pulled out a gun with his right hand, either the seat or something in the middle, and went like that, and aimed anywhere between his hips and his knees, I'm not for sure where, and shot the gun one time."

Motive. "Motive is the moving power that impels one to action for a definite result. Motive is that which incites or stimulates a person to do an action." *State v. Jordan*, 250 Kan. 180, Syl. ¶ 8, 825 P.2d 157 (1992). An example of the proper admission of evidence of prior acts to show motive would be a showing of previous conduct that resulted in longstanding bad blood between an assailant and the victim he or she seeks out. See 250 Kan. at 191.

In the present case, the State contends that Tolson's motive was to get 20 pounds of marijuana without paying Garza for it. The State's position with regard to the relevance of the prior crimes evidence as stated in its brief is: "When his plan went awry, defendant responded with the use of deadly force, as he had been prepared to do in previous situations. The prior possession of the gun along with the drugs explained defendant's motive for possessing the gun—in order to use it if problems arose." The State's theory of the case may explain what happened during the Tolson/Garza transaction, but it does not establish that the evidence of prior acts was relevant to the motive for Tolson's shooting Garza. The evidence of prior acts may show that Tolson was prepared for trouble, but it does not show he created the trouble by trying to steal a substantial quantity of drugs, nor does it show he shot a person he was trying to rob.

Knowledge. Knowledge, which signifies an awareness of wrongdoing, is an element in crimes that require specific intent. *State v. Faulkner*, 220 Kan. 153, 156, 551 P.2d 1247 (1976). The State's reliance on *United States v. Logan*, 121 F.3d 1172, 1178 (8th Cir. 1997), and *United States v. Hardy*, 224 F.3d 752, 757 (8th Cir. 2000), confirms the principle set out in *Faulkner*, that proof of knowledge is meaningful when a specific intent crime is charged. Logan was convicted of conspiracy to distribute, and to possess with intent to distribute, more than 1 kilogram each of heroin and methamphetamine. 121 F. 3d at 1173. Hardy was convicted of possession with intent to distribute crack cocaine and conspiracy to distribute and possess with intent to distribute crack cocaine. 224 F. 3d at 753. In those cases, the court admitted evidence of the defendants' prior possession of drugs. The Eighth Circuit Court of Appeals has held that " 'evidence of prior possession of drugs, even in an amount consistent only with personal use, is admissible to show such things as knowledge and intent of a defendant charged with a crime in which intent to distribute drugs is an element.' " 224 F.3d at 757 (quoting *Logan*, 121 F.3d at 1178).

Tolson was neither charged nor convicted of an underlying felony. He was charged and convicted only of felony murder, which requires no proof of intent. The inherently dangerous felony that

supports his felony-murder conviction is the commission of or attempt to commit or flight from the crime of the sale of marijuana, which includes possession of marijuana with the intent to sell, deliver, or distribute it. Applying the reasoning of the federal cases relied on by the State, the prior crimes evidence was relevant to show Tolson's knowledge of the drug trade and, hence, his intent to distribute the marijuana. The question of whether prior acts evidence is admissible when relevant only to an element of an uncharged predicate felony is not addressed by the State. Our research discloses no cases in which this issue is directly addressed. However, we need not answer that question because in this case, the prior crimes evidence was relevant to the charge of felony murder.

Pursuant to K.S.A. 60-455, evidence is admissible if it is relevant to prove one of the facts specified in 60-455 statute; that fact is a disputed, material fact; and the probative value of the evidence outweighs its potential prejudice. *State v. Rucker*, 267 Kan. 816, 824, 987 P.2d 1080 (1999). Here, the jury was instructed that the State had to prove beyond a reasonable doubt that Tolson killed Austin Garza and that he did so while in the commission of or attempting to commit or in flight from the crime of sale of marijuana. The jury was further instructed on the elements necessary to establish the crime of sale of marijuana. Because the jury is presumed to have taken the elements of the underlying felony into account, as demonstrated by the jury's being instructed on those elements, relevance to an element of the predicate felony reasonably could be found to be sufficient for admissibility. In other words, the jury had to find that Tolson committed the predicate felony before it could find him guilty of felony murder. Thus, the prior acts were relevant to the charged offense and were admissible if the probative value of the evidence for the limited purpose for which it was admitted outweighed the risk of undue prejudice. Here, there was no error in admitting the prior acts for the limited purpose of showing Tolson's knowledge and intent relative to the commission of or attempt to commit or flight from the crime of sale of marijuana.

Tolson next argues that the trial court erred by denying his motion to suppress evidence seized from his residence. During trial, Tolson filed a motion to suppress the physical evidence that had been seized from the house at 8118 Paseo. On the third morning of trial, out of the presence of the jury, the trial court heard the testimony of several police officers on the subject of the warrantless entry of the house and the subsequent search pursuant to warrant. Announcing its ruling from the bench, the trial court denied the defendant's motion to suppress. On appeal, Tolson, without setting out any facts on which he relies, argues that the trial court's ruling was erroneous because the police did not articulate circumstances that would justify the warrantless entry.

As Kansas City, Missouri, and Lenexa police officers arrived at 8118 Paseo, the officer in charge believed that the suspect, Tolson, was in the house at that address. The officer did not know who lived there, but he did know that the person they were looking for was the suspect in a shooting, and he thought the suspect would be armed. The officer had a number of concerns about the circumstances—the suspect might have taken a hostage or hostages, the suspect could destroy evidence, and the people who lived nearby might be in danger. The officer in charge testified that, based on his experience, it was not safe to wait for a warrant before entering a house in such circumstances.

When there were enough officers to surround the house, two officers approached the front door. The officer in charge testified that the officers who approached the front of the house advised by radio that "the front door was ajar or open partially." One of the officers who first approached the front door testified that the door was open and that seeing the open door made them "pretty suspicious of the residence." One of the officers who participated in the sweep testified that the door appeared to be closed, but it was unlocked. The officers knocked, and there was no response. Announcing that they were police, four officers entered the house. They checked the house room by room, checking only spaces big enough to hold a person. The sweep, including two trips to the attic to check under insulation, lasted approximately 5 minutes.

The officers got out of the house, further secured it, and sought a search warrant. While in the house, they had seen in plain view a semiautomatic handgun, a small plastic bag of what appeared to be marijuana, and a trash bag containing what appeared to be marijuana. The affidavit for a search warrant stated that the police officers were applying to search the house at 8118 Paseo for "[a]n unknown black male, wearing T-shirt, and shorts. Firearms, ammunition, shell casings, bloody clothing." The affidavit also stated the circumstances of the shooting in Lenexa, noted that the victim had died, and described the suspect as "a black male wearing a blue ball cap, T-shirt, and shorts driving a black corvette." The affidavit concluded: "A witness at the scene advised the officers that a subject matching the description of the suspect ran into the residence located at 8118 Paseo. The suspect vehicle, a black corvette, was located behind the residence. A blue ball cap was observed . . . inside the suspect vehicle in plain view."

In the district court, Tolson argued that the warrantless entry was illegal because there were no exigent circumstances and, therefore, the subsequent search pursuant to a warrant was illegal. The trial court disagreed, stating:

"The Court does find in this case there are compelling exigent circumstances present here which require in the Court's opinion the police to enter the subject . . . dwelling and conduct a sweep. I understand the defense, the pursuit was cold, broken off and no longer existed, but, quite frankly, I disagree. I think the pursuit was ongoing. It depended in large part on public information being gathered by passersby, pedestrians, and people who had seen the speeding Corvette automobile pass by.

"And so in large part, the success and the pursuit was guided by the information that was coming in. It was coming in on a fairly continuous basis. And that pursuit and that information finally led the pursuit to the residence at 8118 Paseo. We had a police helicopter from Missouri involved, and we had a number of Missouri units canvassing and collecting the area. I'm confident here that we had a pursuit that was still under way which led to the residence at 8118 Paseo.

"Upon entering that or arriving at the residence, officers were confronted by the fact what appeared to be the suspect vehicle in the backyard, suspect who was known to have been involved in a shooting. There was real prospect of a hostage situation taking place in that residence. The Court feels the law enforcement officers involved would have been remiss had they not entered the residence to make sure the residence there was safe and determined whether the suspect was [sic] involved was in the residence.

"I note that the door at the time of entry was at least unlocked, if not partially ajar. There is some question and dispute here as to whether it was open, but in any event it was unlocked, the entry was peaceful. Police made an effort to notify the occupants before they made entry; therefore, I believe the entry here was appropriate and reasonable under the circumstances. The search here was, as I said, a protective sweep. It was limited in its scope, it was limited in its time. Police did not go rummaging through small areas and drawers. During the sweep, they did find in plain view a firearm, ammunition, what appeared to be narcotics, and contraband in plain view.

"So under these circumstances, and in the need for perhaps to protect evidence as well that may have been located in the residence, I do find it was compelling and sufficient exigent circumstances to justify the warrantless entry into this residence."

Tolson concentrates on convincing this court that the circumstances did not justify the officers' warrantless entry into the house. He relies heavily on Colorado and federal cases. We need not consider cases from other jurisdictions because *State v. Weas*, 26 Kan. App. 2d 598, 992 P.2d 221 (1999), *rev. denied* 268 Kan. 895 (2000), which the State cites, is a well-reasoned opinion with circumstances comparable to those of the present case.

In *Weas*, officers were dispatched to talk to a woman who had called 911 to report a possible sexual assault. The victim appeared to have been badly beaten. She was wearing only jeans and a jacket, both turned inside out. She said that she had been kidnapped outside a bar the previous evening, forced into a small vehicle, beaten during the ride, and threatened with death. She believed that she lost consciousness. She woke the next morning in an unfamiliar house and noticed a man in a bedroom. She fled, obtaining assistance and calling 911 from a nearby house. 26 Kan. App. 2d at 599.

Officers went to the house the victim described and noted a small vehicle on the premises. There was no response when one officer knocked on the locked back door and another tried the locked front door. Believing there was probable cause that serious, violent crimes had occurred and trying to prevent destruction of evidence as well as identify and apprehend the perpetrators, the officers decided that immediate entry into the house was necessary. One climbed through an open window and opened a door for the other. They searched the house for suspects, but no one was there.

While in the house, the officers saw in plain view drugs and drug paraphernalia. 26 Kan. App. 2d at 599-600.

The Court of Appeals concluded that exigent circumstances existed, permitting a warrantless entry into the house. The Court of Appeals cited *State v. Platten*, 225 Kan. 764, 769, 594 P.2d 201 (1979), in which the court relied on the nonexclusive list of factors set forth in *United States v. Reed*, 572 F.2d 412, 424 (2d Cir.), *cert. denied* 439 U.S. 913 (1978):

" '(1) the gravity or violent nature of the offense with which the suspect is to be charged; (2) whether the suspect is reasonably believed to be armed; (3) a clear showing of probable cause; (4) strong reasons to believe that the suspect is in the premises; (5) a likelihood that the suspect will escape if not swiftly apprehended and (6) the peaceful circumstances of the entry. It is also recognized that the possible loss or destruction of evidence is a factor to be considered. [Citations omitted.]' 225 Kan. at 770." *Weas*, 26 Kan. App. 2d at 601.

For the following reasons, the Court of Appeals in *Weas* viewed the action taken by the officers as objectively reasonable under the *Reed* criteria:

"The crime of kidnapping is a severity level 3 person felony with a presumptive sentence that includes incarceration. In addition, there is evidence the perpetrators threatened to kill the victim and did beat her. Although it is true that the victim did not relate to the officers that her attackers were armed, the serious nature of the alleged crimes would give rise to 'an ever-present potential for exploding into violent confrontation.' *People v. Escudero*, 23 Cal. 3d 800, 811, 153 Cal. Rptr. 825, 592 P.2d 312 (1979). The officers had ample evidence of probable cause to believe one or more individuals who had committed these violent crimes were in the residence and would be alerted to detection and apprehension as a result of the victim's escape. Finally, the entry into the residence was during daylight hours and made peaceably. Another important factor noted in *Platten* is whether an immediate entry is necessary so that a perpetrator can be disabled from destroying or concealing evidence. In this case, the officers knew the perpetrators very probably were alerted by the victim's escape and given the opportunity could destroy physical and trace evidence. It is not unreasonable for the officers to believe hair, blood, and other bodily fluids could be washed off the body easily." 26 Kan. App. 2d at 601-02.

In the present case, the crime was a shooting. The police knew either that the victim's life was in grave danger or that he already had died. They knew that the suspect was armed, and they had evidence of probable cause to believe that the suspect was in the

house at 8118 Paseo. In addition to the factors considered in *Weas*, in the present case the officers were concerned because they did not know who lived in the house and that the suspect might have taken a hostage or hostages. The officers also were concerned for the safety of neighbors. As in *Weas*, the officers in this case did not want to give the suspect an opportunity to destroy evidence of the shooting. In these circumstances, it is objectively reasonable to conclude that exigent circumstances existed that permitted a warrantless entry into the house. The district court did not err in finding exigent circumstances existed to justify the warrantless entry into the residence. In light of this holding, we need not consider Tolson's argument that the warrantless entry was illegal, thus rendering the evidence seized pursuant to the search warrant inadmissible.

Affirmed.

LARSON, S.J., assigned.