No. 88,720

STATE OF KANSAS, *Appellee,* v. CHARLIE M. JONES, JR., *Appellant.*
(85 P.3d 1226)

Opinion filed
March 19, 2004.

*Mary Curtis,* assistant appellate defender, argued the cause and was on the brief for appellant.

*Debra S. Peterson,* assistant district attorney, argued the cause, and *Lesley A. Isherwood,* assistant district attorney, *Nola Foulston,* district attorney, and *Phill Kline,* attorney general, were on the brief for appellee.

The opinion of the court was delivered by

NUSS, J.: This case concerns sexual conduct between Charlie M. Jones, Jr., and his natural daughter and stepdaughter. A jury convicted him of one count of rape, two counts of aggravated incest, one count of aggravated indecent liberties with a child, and one count of incest. The jury then proceeded to a separate sentencing phase and rendered a unanimous verdict finding the presence of six factual allegations, three of which were later used as aggravating factors to impose an upward durational departure of 32 months on the sentence for one of the aggravated incest convictions. The district court then sentenced him to 840 months' confinement. Jones now raises four issues in his direct appeal:

1. Did the district court err in admitting evidence regarding a prior conviction for indecent liberties with a child under the plan exception of K.S.A. 60-455?

2. During the time interval between *State v. Gould,* 271 Kan. 394, 23 P.3d 801 (2001), and the 2002 amendments to K.S.A. 21-4716, did the district court have authority to impose an upward durational departure sentence if a jury found the existence of aggravating factors?

3. If the district court was authorized to use a separate upward durational departure sentencing procedure, did such procedure violate the Sixth and Fourteenth Amendments to the United States Constitution?

4. Did the district court violate the Double Jeopardy Clause when sentencing Jones for rape based on a criminal history score of A and for aggravated incest based on the jury's factual finding that he was a sexual predator?

Our jurisdiction is pursuant to K.S.A. 20-3018(c), transfer by our own motion. We reverse the convictions and remand for a new trial because of error on issue 1, which makes the remaining issues moot.

## FACTS

Charlie M. Jones, Jr., was paroled from prison in 1990 after being convicted of indecent liberties with a child in 1988. He moved to Wichita, where he met Lorie W., the mother of M.W.,

one of the alleged victims in this case. In October 1993, Jones, Lorie and M.W., then 9 years old, moved in together. Jones and Lorie considered their relationship a common-law marriage.

M.W. testified that shortly after she turned 12 in August 1996, Jones began to have sexual intercourse with her. She does not recall any type of sexual contact occurring before that time. Jones continued to have sex with M.W. at least once a week until July 2001, sometimes in her bed and other times in the bedroom he shared with Lorie. M.W. testified that she and Jones also had sex in the living room of the house. Sometimes Jones requested that M.W. and Lorie have sex with him in the same room at the same time. According to M.W., Jones told her he loved and cared for her very much. She testified she still loved him very much.

At the time the alleged intercourse began between Jones and M.W., Lorie and Jones had two small children of their own and Lorie was pregnant with a third. In 1998, after approximately 2 years of sexual activities, M.W., then 14, told Lorie that Jones had been having sex with her. M.W. further testified that she heard her mother tell Jones about the conversation, but the activities continued.

In May 1999, S.J., the other alleged victim in this case, moved into the Jones household. She is Jones' natural daughter from a previous marriage and was born in May 1983. At the time she moved in, her mother was serving a prison sentence and her living arrangement with an aunt was not working out. Jones therefore obtained custody through court proceedings, though S.J. testified they had not seen each other for at least 6 years. When S.J. moved in, she shared a bedroom with M.W., who was 15 months younger.

Two weeks after S.J. moved in, Jones allegedly engaged in a group sex act with M.W., S.J., and Lorie in the living room one evening after the three small children had been put to bed. S.J. testified that Jones had approached her about a "little cult . . . with witchery and things" that existed in the family. He told her that participation involved an initiation, an oath, and then all three women would have sex with him. On that specific occasion, he first fondled M.W. and S.J. vaginally while alone with them. According to S.J., all three women then dressed in their

"colors," *i.e.*, different colored lingerie, and took their turn having intercourse with him seated on the couch while he digitally penetrated the others. M.W. testified that afterward, Jones told all the women that he loved them. At the time this occurred, M.W. was 14 and S.J. had just turned 16.

S.J. testified that Jones continued to have sex with her one to two times per week following this 1999 incident up until the time she moved out of the house in July 2001 after turning 18. According to S.J., she was forced to engage in sex acts in the living room, Jones' bedroom, the bedroom she shared with M.W., the bathroom, the kitchen, the shed, and the camper. In addition to S.J.'s testimony, M.W. testified that Jones continued to have sex with her after the group sex incident and past her 16th birthday in 2001.

On July 30, 2001, — the month that S.J. had moved out — police responded to a domestic violence incident involving S.J. and Jones. According to S.J., she and Jones were arguing over the telephone when Jones threatened to show her "what the business end of a shotgun was for." She testified she was irritated by the comment and sick of his threats. At the time of the conversation, S.J. was with her boyfriend's mother, who encouraged her to file a police report about the threat. When contacted by a police officer, S.J. not only mentioned the threat but also alleged the ongoing sexual abuse by Jones. The officer told her to file a report with the Exploited and Missing Child Unit (EMCU) of the Wichita Police Department. That same day, S.J. met with a detective from EMCU and described the abuse.

Initially during the resultant investigation, M.W. denied ever having sex with Jones, but was extremely fragile and would often break down and cry. Nevertheless, following her interview on July 30, authorities took M.W. and the three younger Jones children into protective police custody. In late October, police and social services conducted another interview with M.W. The first 30 minutes went much like the July interview, but she then began to disclose the alleged sexual abuse by answering the interviewer's question with "where hasn't he touched me."

During the time of the alleged abuse, M.W. had been caring for the three younger children as permitted by her home schooling

schedule. She testified Jones told her if other people found out about their sexual activities that the children would be taken away, which she did not want to happen. After July 30, the authorities did not allow her to see them except every 2 months. After her police interview in late October, she was allowed to see them every other week.

On November 8, 2001, an amended eight-count information was filed against Jones. Seven counts incorporated various allegations of sexual abuse committed by Jones against S.J. and M.W., which allegedly occurred at different intervals of time.

Prior to the January 2002 jury trial, the State filed a motion pursuant to K.S.A. 60-455 seeking to introduce Jones' 1988 conviction for indecent liberties with a child to show his intent, plan, and preparation. The district court ruled the evidence was admissible for the purpose of plan only. At trial, defense counsel renewed his objection to the evidence and asked for a continuing objection. At defense counsel's request, the district court gave a limiting instruction to the jury prior to the witness' testimony and again before its deliberations.

The State introduced the indecent liberties evidence through the 1988 journal entry of conviction and through testimony of L.D., the victim. L.D. testified that she was born in July 1973 and that her natural mother, Loretta, married Jones when L.D. was approximately 8-10 years old. In May 1983, when L.D. was approximately 10 years old, Loretta gave birth to Jones' child, S.J.

L.D. testified that Jones began molesting when she was approximately 8 or 9 years old. He did so by taking off her clothes, touching her with his hands and penis, and rubbing himself on her. Jones attempted but never achieved sexual intercourse with L.D. She testified he would masturbate, fondle her vagina and breast area, and tell her that he loved her. He also wanted her to say she loved him.

According to L.D., these incidents occurred in her bedroom if no one was home, the dining room, and "just wherever" in the house. Jones would come into her room at night with her mother sleeping in the next room and would also take her from school so he could molest her. She testified that on about four occasions

Jones molested her in a little bathroom stall and once in a small travel trailer where the family lived.

L.D. testified that she never told her mother about the abuse and that Jones told her to keep it a secret. She eventually reported it, and in January 1988 when L.D. was 14, Jones pled guilty to one count of indecent liberties with a child.

On cross-examination, defense counsel established that L.D.'s mother never participated in those activities and there was no talk of colors, rituals, or "family values."

Several people testified for the defense. Jones flatly denied he ever sexually abused M.W. or S.J. He also maintained that at the time of the group sex incident involving M.W., S.J., and Lorie, his back was injured. Lorie — his wife and M.W.'s mother — corroborated his denial by testifying that the allegations by M.W. and S.J. were false and that she had no knowledge of Jones' sexually abusing them. Another witness, a neighbor and friend of M.W. and S.J. who was present almost daily in the Jones' home for home schooling, testified that she never observed or was told anything which would have indicated Jones was sexually abusing M.W.

Additionally, M.W.'s grandmother testified that she was in the home on a weekly basis and never saw any inappropriate touching between Jones and either M.W. or S.J. She further testified that she asked M.W. several times if Jones was molesting her and M.W. said "no". Finally, Jones' employer testified that beginning May 7, 1999, through mid-July 1999 — when the group sex incident allegedly occurred and the abuse of S.J. began — Jones was taking leave from work for a back injury.

The jury convicted Jones of the following charges:

For conduct involving S.J.:

Count I: Aggravated incest in violation of K.S.A. 21-3603(a)(2)(A), a severity level 5 person felony involving the victim S.J., then 16 years of age but under 18 years of age, and occurring between May 29, 1999, and May 12, 2001.

Count II: Incest in violation of K.S.A. 21-3602, a severity level 10 person felony involving the victim S.J., then 18

years of age, and occurring between May 13, 2001, and July 1, 2001.

For conduct involving M.W.:

Count IV: Rape in violation of K.S.A. 2002 Supp. 21-3502(a)(2), a severity level 1 person felony involving the victim M.W., then under 14 years of age, and occurring between August 22, 1997, and August 22, 1998.

Count V: Aggravated indecent liberties with a child, in violation of K.S.A. 21-3504(a)(1) a severity level 3 person felony involving the victim M.W., then 14 years old, and occurring between August 23, 1998, and August 22, 2000.

Count VI: Aggravated incest in violation of K.S.A. 21-3603(a)(2)(A), involving the victim M.W., then 16 years of age but less than 18 years of age, occurring between August 23, 2000, and June 1, 2001.

Jones was found not guilty of the remaining three charges: Count III, criminal threat involving S.J.; Count VII, aggravated criminal sodomy involving M.W.; and Count VIII, criminal sodomy involving M.W.

## ANALYSIS

Issue: *Did the district court err in admitting evidence regarding a prior conviction for indecent liberties with a child under the plan exception of K.S.A. 60-455?*

Few areas of our jurisprudence have been subject to more conflicting views and decisions than the application of K.S.A. 60-455. *State v. Rucker,* 267 Kan. 816, 824, 987 P.2d 1080 (1999). As in *Rucker,* "[w]e will not by this case solve any of the problems spawned by a myriad of prior cases." 267 Kan. at 824. The statute provides:

"Subject to K.S.A. 60-447 evidence that a person committed a crime or civil wrong on a specified occasion, is inadmissible to prove his or her disposition to commit crime or civil wrong as the basis for an inference that the person committed another crime or civil wrong on another specified occasion but, subject to K.S.A. 60-445 and 60-448 such evidence is admissible when relevant to prove

some other material fact including motive, opportunity, intent, preparation, *plan*, knowledge, identity or absence of mistake or accident." (Emphasis added.) K.S.A. 60-455.

According to *State v. Tiffany*, 267 Kan. 495, 986 P.2d 1064 (1999), our standard of review for the admission of evidence of prior sexual misconduct under K.S.A. 60-455 contains several parts. (1) The evidence must be relevant to prove one of the facts specified in the statute; (2) the fact is a disputed, material fact; and (3) the probative value of the evidence sought to be admitted outweighs its potential prejudice. If these three requirements are met, the scope of appellate review is limited to whether the trial court abused its discretion. 267 Kan. at 498. Discretion is abused only where no reasonable person would take the trial court's view. *State ex rel. Stovall v. Alivio*, 275 Kan. 169, 173, 61 P.3d 687 (2003).

Jones contends the trial court erred in admitting evidence under K.S.A. 60-455 of his 1988 conviction for indecent liberties because it was not probative of any material fact and was unduly prejudicial. The State responds that the evidence was relevant to show plan under K.S.A. 60-455, that it was more probative than prejudicial, and that the prejudicial effect, if any, was tempered by the limiting instruction.

*State v. Damewood*, 245 Kan. 676, 681-82, 783 P.2d 1249 (1989), describes the rationale for admitting evidence of prior unrelated acts to show plan under K.S.A. 60-455:

"Admission of evidence under 60-455 to show plan has been upheld under at least two theories. In one the evidence, though unrelated to the crimes charged, is admitted to show the modus operandi or general method used by a defendant to perpetrate similar but totally unrelated crimes.

. . . .

"The rationale for admitting evidence of prior unrelated acts to show plan under K.S.A. 60-455 is that the method of committing the prior acts is *so similar* to that utilized in the case being tried that it is reasonable to conclude the same individual committed both acts. In such cases the evidence is admissible to show the plan or method of operation and conduct utilized by the defendant to accomplish the crimes or acts. [Citation omitted.]

"Another line of cases has held evidence of prior crimes or acts is admissible to show plan where there is some direct or causal connection between the prior conduct and the crimes charged." (Emphasis added.)

Jones' argument tests the first theory. Specifically, his claim that the prior conviction evidence was irrelevant to show plan rests on the contention that "the prior crime was not sufficiently similar to the crimes for which he was on trial."

A number of decisions have upheld the admission of K.S.A. 60-455 evidence in sex cases where the details of the plan for the prior crime and the crime for which the defendant was on trial were "strikingly similar." See, *e.g.*, *Rucker*, 267 Kan. at 826-29; *Tiffany*, 267 Kan. at 497-502; *Damewood*, 245 Kan. at 682; *State v. Aldaba*, 29 Kan. App. 2d 184, 189-92, 25 P.3d 149 (2002). In *State v. Tolson*, 274 Kan. 558, 56 P.3d 279 (2002), the case upon which Jones principally relies, we held that *Damewood* contained so distinct a method of operation as to be a "signature." 274 Kan. at 564. The State, however, points to cases such as *State v. Clements*, 252 Kan. 86, 90, 843 P.2d 679 (1992), where we have upheld the admission of such evidence with no requirement of "striking" similarities but because the evidence showed that the general method used is "similar enough to show a common approach that is tantamount to a plan."

The facts of this case fail to meet either standard of similarity. The support for this conclusion is demonstrated by comparing Jones' prior conduct involving L.D. to the later conduct involving each of the alleged victims in this case.

Beginning with M.W., we find some similarities. Both L.D. and M.W. were stepdaughters, the sexual abuse began when they were 12 or younger, the incidents occurred in various rooms throughout the house, and Jones would tell the girls he loved them. He expressly told L.D. to keep the conduct a secret, while he implied secrecy to M.W. by saying they might lose the three younger children if the conduct was revealed, something she did not want to have happen. The differences, however, were substantial. Jones tried but never accomplished intercourse with L.D. but did so with M.W. on at least a weekly basis for several years. Additionally, his sexual encounters with M.W. began directly with intercourse, while according to L.D.'s testimony hers began and essentially ended with fondling. Moreover, Jones abused L.D. only in isolation, while

there were group sex acts involving M.W., Lorie, Jones, and on one occasion, S.J.

The conduct involving S.J. measured against the conduct involving L.D. is even more dissimilar. S.J. was Jones' biological daughter whose sexual activities began when she was 16 years old, not a stepdaughter like L.D. whose abuse began when she was 8 or 9 years old. Additionally, S.J.'s activities began with sexual intercourse in a group, not fondling in private as with L.D. Furthermore, S.J. was brought into the fold of sexual abuse already occurring in the household against M.W. under the guise there was a family "cult" involving witchery, "colors," and rituals, while L.D. admitted nothing like this occurred with her. Finally, the conduct involving S.J. primarily consisted of sexual intercourse one to two times a week, while the conduct involving L.D., with the exception of attempts, excluded intercourse. The only similarities between the conduct involving L.D. and S.J., besides their gender, were that Jones told them both he loved them and subjected them to sexual activities in numerous locations. Indeed, several of the similarities between Jones' conduct with L.D. on the one hand and with S.J., and M.W. on the other, *e.g.*, one gender, and various locations, may be present in many child sexual abuse scenarios. See *State v. Davidson,* 31 Kan. App. 2d 372, 384, 65 P.3d 1078, *rev. denied* 276 Kan. 971 (2003).

Compare *Rucker,* 267 Kan. at 826-29 (similar abuse in that both victims 5-year-old stepchildren abused until puberty; defendant applied lubricant, rubbed their vaginal areas with his penis until ejaculation, slapped them if they protested, threatened to kill their pets); *Tiffany,* 267 Kan. at 497-502 (similar words used to entice victims into performing requested acts, victims about the same age, and criminal conduct performed in same manner); *Damewood,* 245 Kan. at 679-82 (same pattern of conduct or method of operation shown to have been followed on previous occasion, *i.e.*, arranging time alone with young teenage boys by involving them in beekeeping activities, then sexually molesting them); *Aldaba,* 29 Kan. App. 2d at 189-92 (both victims were young boys when molested, in both incidents perpetrator forced his penis into child's mouth, both incidents occurred when defendant staying overnight in same res-

idence with victim and each victim threatened with bodily harm if abuse was revealed.)

In short, there simply was insufficient evidence presented to show a distinct method of operation that could be considered "signature" or "strikingly similar" or even "similar enough" for K.S.A. 60-455 purposes. Consequently, the district court erred in admitting the prior conviction evidence under the plan exception contained in that statute.

Now that we have established that the evidence was not admissible to show plan, we next consider whether the error was harmless. We recently discussed the harmless error rule in *State v. Henry*, 273 Kan. 608, Syl. ¶ 7, 44 P.3d 466 (2002):

"Normally, the admission or exclusion of evidence is measured by the harmless error rule. In determining if the erroneous admission or exclusion of evidence is harmless, the appellate court must consider if it is inconsistent with substantial justice, *i.e.*, affects the substantial rights of a defendant and, if not, whether this court can declare beyond a reasonable doubt that the error had little, if any, likelihood of having changed the result of the trial."

We start by observing that the absence of physical evidence of abuse transformed this case into a credibility battle. On the one hand, Jones testified and denied the allegations. His employer corroborated that during the time S.J. claimed the group sex incident occurred and the abuse began with her, Jones was on a 2-month leave from work for a back injury. Lorie—Jones' wife and M.W.'s mother—corroborated her husband's denial. A girl who was friend and neighbor to M.W. and S.J.—who was present almost daily in the Jones' home—testified that she never observed or was told anything which would have indicated Jones was sexually abusing M.W. Finally, M.W.'s grandmother testified that she was in the home on a weekly basis, never saw any inappropriate touching between Jones and either M.W. or S.J., and when she asked M.W. several times if Jones was molesting her, M.W. said, "No."

For the State, the two victims' testimony about the alleged abuse was corroborated only by the accounts they told other witnesses, including police investigators. Furthermore, M.W. was reticent in disclosing the alleged abuse and, as argued by defense counsel, her initial disclosures of abuse in a police interview conducted 3

months after her first interview may have been motivated by her belief the disclosures would lead to reunifying her with the small children for whom she cared deeply. Indeed, after her October disclosures, she was allowed to see the children much more often. Moreover, as Jones argues, S.J.'s accusations may have been made in anger and in retaliation against Jones' alleged threats to show her "the business end of a shotgun."

In light of all the testimony presented, the jury might have believed Jones' version were it not for the admission of the 1988 prior conviction evidence. That evidence, since it failed to meet the plan exception listed in K.S.A. 60-455, may have unfairly created the inference that Jones had a disposition to commit the numerous crimes for which he had been charged. The prior conduct was the focal point in the State's case and was mentioned at least four times in its closing argument, including in the following statement: "This defendant is not rehabilitated. He molested [L.D.], and he had sexual intercourse with [S.J.], sexual intercourse with [M.W.]. I ask that you find him guilty of each of these counts 'cause he is guilty."

Accordingly, we conclude the evidence was unduly prejudicial, and we are unable to declare beyond a reasonable doubt that its erroneous admission had little, if any, likelihood of having changed the result of the trial. *Henry,* 273 Kan. 608, Syl. ¶ 7. Indeed, evidence of a defendant's prior sexual misconduct—particularly when, as here, both the prior conduct and the conduct for which he is presently on trial involve minors—can easily convert to evidence for propensity or other impermissible purposes. As the court stated in *United States v. Peden,* 961 F.2d 517, 520 (5th Cir. 1992):

"[A]dmission of prior wrongful acts simply to show the defendant's bad character, notwithstanding that one possessed of a bad character is more likely to commit a crime than one who is not, is likely to prejudice the jury and blind it to the real issue of whether the defendant is guilty of the crime charged. For example, the jury may feel unsure that the government has proven its case, but decide that the defendant is an evil person who belongs in prison anyway. The jury may wish to punish the defendant for the prior act, even if they are unconvinced that he committed the act charged. Moreover, the jury may be unconvinced that the defendant committed either act, but that he more than likely committed at least one of them and should be punished."

Therefore, Jones' case must be reversed and remanded for a new trial. All Jones' remaining issues concern alleged sentencing errors which are moot and should not arise again in light of *State v. Kessler*, 276 Kan. 202, 216-17, 73 P.3d 761 (2003).

Reversed and remanded.

Davis, J., dissenting: I respectfully disagree with the majority opinion regarding the admissibility of the defendant's prior conviction for indecent liberties with a child. I agree with the trial court's admission of this conviction under the plan exception of K.S.A. 60-455. I would, therefore, affirm the defendant's convictions in this case.

There can be no doubt that the evidence of prior sexual misconduct in this case related to the plan exception under K.S.A. 60-455. Although the defendant denied having any sexual contact with his minor stepdaughter or minor natural daughter, the victims, including the prior crime victim, testified that he had. The question presented is whether the trial court abused its discretion in the admission of the defendant's prior conviction. While the majority briefly mentions this as being the appropriate standard of review, the majority opinion did not fully articulate the following standard, nor in my opinion did the majority apply this standard:

"The admission of evidence lies within the sound discretion of the trial court. [Citation omitted.] An appellate court's standard of review regarding trial court's admission of evidence, subject to exclusionary rules, is abuse of discretion. Judicial discretion is abused when judicial is arbitrary, fanciful, or unreasonable. If reasonable persons could differ as to the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion. One who asserts that the trial court abused its discretion bears the burden showing such abuse of discretion. [Citation omitted.]" *State v. Jenkins*, 272 Kan. 1366, 1378, 39 P.3d 47 (2002).

The majority opinion cites to a number of our past decisions including *State v. Damewood*, 245 Kan. 676, 682, 783 P.2d 1249 (1989), which describes the rationales for admitting evidence of prior unrelated acts to show plan under K.S.A. 60-455. One such rationale advanced by *Damewood* is as follows: "Admission of evidence under 60-455 to show plan has been upheld under at least

two theories. In one the evidence, though unrelated to the crimes charged, is admitted to show the *modus operandi or general method used by a defendant to perpetrate similar but totally unrelated crimes.*" (Emphasis added.) 245 Kan. at 681-82.

The majority in this case concludes that the facts failed to meet a standard of similarity and that "there simply was insufficient evidence presented to show a distinct method of operation that can be considered 'signature' or 'strikingly similar' or even 'similar enough' for K.S.A. 60-455 purposes. Consequently, the district court erred in admitting the prior conviction evidence under the plan exception contained in that statute." This conclusion in my opinion appears to be a legal conclusion without any consideration of our actual standard of review as set forth above. While acknowledging similarities between the defendant's past conviction and the present crimes, the majority focuses on the dissimilarities in its legal conclusion that the evidence demonstrates trial error.

The similarities between the defendant's past conviction and his charged crimes bear repeating. First and foremost, the modus operandi of the defendant in both the past crime and the present crimes is to befriend a woman who has a minor daughter from a previous marriage. The friendship with the mother of the minor daughter results in marriage, and the defendant becomes a member of the family and the stepfather of the minor daughter. He gains the trust of the minor child and proceeds to sexually abuse the minor child. The evidence discloses the following additional similarities. The circumstances of the makeup of the defendant's family in both the past offense involving L.D. and the present offense involving M.W. are especially similar. In both cases, close in time to when the defendant's then wife would have another child, the defendant would begin sexually abusing the stepdaughter. Both minor stepdaughters were close in age when the abuse began. Further, the girls' genital regions were molested; in addition, there were acts of penetration which were attempted in L.D.'s case but accomplished against M.W. As with L.D., the defendant would tell the girls he loved them after the acts were completed. In both cases, the defendant stressed to his victims the need for secrecy

about his conduct. And in both cases, the girls were violated in various rooms throughout the house.

Thus, the facts herein establish a pattern of escalating criminal sexual activities between the defendant and young girls living in his home. The facts in the prior conviction (L.D.) involved the defendant marrying a woman with an 8-to 9-year-old daughter. The defendant fondled L.D. on many occasions in the home, out of the presence of anyone else. Sexual intercourse did not occur. As to M.W., the defendant moved in with 9-year-old M.W. and her mother, as his common-law wife. He had sexual intercourse with M.W. in many areas of the home while he and M.W. were alone. After this had been going on for several years, the defendant went to court to secure custody of his natural daughter, S.J., age 16, whom he had not seen for 6 years. Shortly after the defendant moved his daughter into his home, his activities escalated into group sex involving himself, both girls, and the common-law wife.

All three victims were young girls who became available to the defendant in his residence by his having entered into marriage relationships with the girls' mothers or his acquisition of legal custody of his natural daughter. The escalation in the level of sexual activity with each new victim as the defendant became increasingly emboldened does not diminish the factual basis supporting the finding of a plan under K.S.A. 60-455; in fact, it supports the finding. Through his plan, the defendant was able to satisfy his increasing sexual desire for young girls involved in a familial relationship with him.

Some of the dissimilarities referenced in the majority opinion primarily between L.D. and M.W. could be described as "accidental" or irrelevant to the similarities in the sexual abuse. The fact that the defendant attempted but never accomplished intercourse with L.D., but actually achieved intercourse with M.W. and S.J., was not so much a dissimilar act as it was a failed attempt to complete a similar act. The crucial point is that the defendant wanted to have sexual intercourse with his stepdaughters and daughter and attempted to satisfy those desires.

Furthermore, the fact that the defendant may have engaged in group sex with M.W., S.J., and his common-law wife but did not

participate in group sex with L.D. and her mother, who had no knowledge of the sexual abuse, is seemingly irrelevant to whether the defendant did in fact sexually abuse both of his stepdaughters while he was isolated with them. His decision to add new variations of sexual acts and family members to his plan or method of operation does not discount the similarities between the defendant's tried and true methods when he was alone with his daughter or stepdaughters. The focus on these dissimilarities, rather than the true similarities between the crimes, is where I believe the majority is wrong.

In its focus upon the dissimilarities, the majority relies in part upon *State v. Davidson*, 31 Kan. App. 2d 372, 383-84, 65 P.3d 1078, *rev. denied* 276 Kan. 971 (2003), in which Judge (now Justice) Beier discussed the *Damewood*, 245 Kan. 676; *State v. Rucker*, 267 Kan. 816, 987 P.2d 1080 (1999); and *State v. Tiffany*, 267 Kan. 495, 986 P.2d 1064 (1999), cases regarding the plan exception under K.S.A. 60-455. *Davidson* held that it was reversible error to admit the 60-455 evidence under various bases, including plan. However, in comparing Davidson's prior conduct and the charged crime, the court found some similarities and, in addition, several dissimilarities as "[m]ost of the charged acts do not match the behavior engaged in with the girls, and the victims were different genders." 31 Kan. App. 2d at 384. However, in this case the defendant's behavior was quite similar, and the victims were related and the same gender.

An example of focusing upon similarities instead of dissimilarities is illustrated in *Tiffany*, where the defendant was charged with forcing the 7-year-old granddaughter of a friend to masturbate him until he ejaculated. The district court admitted evidence of prior uncharged sex crimes that the defendant had masturbated in front of his 5- or 6-year-old daughter and made her rub his penis until ejaculation, that his 8- or 9-year-old daughter had rubbed his penis at his request, and that he had exposed his penis and masturbated in front of a 13- or 14-year-old boy that he was living with at the time.

On appeal, this court noted that the evidence admitted was limited to a "strikingly similar" method of operation, as similar acts

were used to entice the victims into performing the requested acts, the victims were all about the same age, and the criminal conduct was performed in the same manner. The court concluded that *Damewood* and *State v. Clements,* 252 Kan. 86, 843 P.2d 679 (1992), controlled the case, as " '[t]he general method used . . . is similar enough to show a common approach that is tantamount to a plan.' " *Tiffany,* 267 Kan. at 502 (quoting *Clements,* 252 Kan. at 90).

Unlike the majority in this case, the *Tiffany* court focused on the similarities between the acts rather than the dissimilarities between the prior acts and the charged crime. The court could have just as well said that the prior acts were dissimilar because they involved a victim related to the defendant, involved a victim of a different gender, involved a situation where the victim did not actually masturbate the defendant, and involved victims ranging in age from 5 to 14. As such, the similarities between the acts, rather than the dissimilarities, should be the main focus of the analysis.

Whether under the rationale of "strikingly similar" or "similar enough," a wide degree of latitude is granted to the trial court to make a decision as to whether such evidence is similar enough to allow it into evidence under K.S.A. 60-455 to show plan. As indicated above, the majority seems to state our standard of review but resolves this case as a matter of law that the evidence is simply not similar enough. The ultimate question is whether the trial court abused its discretion in admitting the defendant's prior indecent liberties with a child conviction. In my opinion, the decision of the trial court was not arbitrary, fanciful, or unreasonable and, at the very least, reasonable persons could differ as to the propriety of the action taken by the trial court.

The Pattern Instructions for Kansas (PIK) Comments relating to proof of other crimes note that this court has taken a more "liberal view" of admitting K.S.A. 60-455 evidence in sexual misconduct cases. See PIK Crim. 3d 52.06, Comment II. E, p. 64. Our prior decisions set forth in this dissent and the majority decision supports the PIK Comments. This liberal view stems, in my opinion, from the basic similarities that exist in these kinds of cases and the modus operandi which frequently occur. The sexual acts

are visited upon minors and occur because of the relationship of trust cultivated by the defendant in a familial setting. It is this basic similarity that triggers the inquiry as to whether the past conduct of the defendant when compared with the crimes charged is admissible to show modus operandi. See *Damewood*, 245 Kan. at 681-82.

Further support for this liberal view in sexual misconduct cases is found in federal statutes and case law. Federal Rule of Evidence 413(a) provides: "In a criminal case in which the defendant is accused of an offense of sexual assault, evidence of the defendant's commission of another offense or offenses of sexual assault is admissible, and may be considered for its bearing on any matter to which it is relevant." Likewise, Federal Rule of Evidence 414 extends that rule to admit prior child molestation offenses in prosecutions for child molestation for its bearing on any relevant matter. Fed. R. Evid. 413 and 414.

In upholding the constitutionality of these statutes, the Tenth Circuit Court of Appeals noted that plausible reasons existed for the enactment of Rule 414, including the legitimate interest of Congress' objective of enhancing effective prosecution of sexual assaults and the government's "particular need for corroborating evidence in cases of sexual abuse of a child because of the highly secretive nature of these sex crimes and because often the only available proof is the child's testimony. [Citation omitted.]" *United States v. Castillo*, 140 F.3d 874, 883 (10th Cir. 1998). While K.S.A. 60-455 is certainly not as permissive in admitting prior crimes evidence in sexual misconduct cases, the reasoning in enacting the federal statutes is persuasive and supports the more liberal construction that this court has applied in those types of cases in the past.

I conclude, consistent with our past decisions, that the facts and circumstances concerning the defendant's conduct in the prior conviction was similar enough to his conduct in some of the instant charges, especially as it pertains to M.W., to warrant admission of the defendant's prior conviction for indecent liberties with a child. I particularly note that given the similarities, it is difficult to con-

clude that the trial court abused its discretion in admitting the prior conviction evidence.

While K.S.A. 60-455 does not include "unfair prejudice" language, this court read "unfair prejudice" into K.S.A. 60-455 in *State v. Davis*, 213 Kan. 54, 57, 515 P.2d 802 (1973), and when we held: "Evidence which is more prejudicial than probative is inadmissable pursuant to K.S.A. 60-455." *Ratterree v. Bartlett*, 238 Kan. 11, Syl. ¶ 3, 707 P.2d 1063 (1985).

Relying upon what may be considered a rule of necessity arising out of the above decision, the defendant claims the prior crime evidence was unfairly prejudicial. However, all evidence that is derogatory to a defendant is by its nature prejudicial to the defendant's claim of innocence. Evidence that actually or probably brings about the wrong result under the circumstances of the case is "unduly prejudicial." *State v. Clark*, 261 Kan. 460, 477, 931 P.2d 664 (1997).

In my opinion, there was little chance, if any, that the prior conviction evidence in this case brought about the wrong result. Moreover, prejudice can be minimized in K.S.A. 60-455(b) cases by a limiting instruction, especially if given prior to the testimony concerning the prior conviction and before deliberations. See, *e.g.*, *State v. Lane*, 262 Kan. 373, 391, 940 P.2d 422 (1997); see also *Clements*, 252 Kan. at 89 (finding no abuse of discretion in admitting prior sex offense conviction through victim where jury was instructed prior to testimony and by written instructions before deliberations). This is exactly the procedure that was followed in the case now being considered. Under these circumstances, in my opinion, the prior crime evidence was not unfairly prejudicial.

For all of the above reasons, I conclude that the prior crime evidence in this case was admissible and that the trial court, based upon the similarities existing between the prior crime and the crime charged, did not abuse its discretion in admitting this evidence.

McFARLAND, C.J., joins in the foregoing dissent.